## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARCOS RIOS | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO: 5:23-CV-1310** |
| | § | |
| CORPORAL CHRISTOPHER PEREZ, | § | |
| OFFICER AMANDA LARA, | § | |
| SECURITY OFFICER JOE FLORES, | § | |
| OFFICER THOMAS SARINANA, | § | |
| OFFICER JOANN GUTIERREZ, | § | |
| VIA METROPOLITAN TRANSIT, and | § | |
| UNIVERSAL PROTECTION SERVICE, | § | |
| LP, | § | |
| | § | |
| *Defendants*. | § | |

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

---

NOW COMES Plaintiff **MARCOS RIOS**, by and through his attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendant **VIA METROPOLITAN TRANSIT**, its officers, **CORPORAL CHRISTOPHER PEREZ**, **OFFICER AMANDA LARA**, **OFFICER THOMAS SARINANA**, **OFFICER JOANNA GUTIERREZ**, and its agent, **SECURITY OFFICER JOE FLORES**, trained and employed by **UNIVERSAL PROTECTION SERVICE, LP, a/k/a Thrive Intelligence, Allied Universal Security Services, and Allied Universal Risk Advisory and Consulting Services**, and respectfully alleges as follows:

### <u>INTRODUCTION</u>

1.      Marcos "Marc" Rios, a lawful citizen, brings this civil action for damages against VIA Metropolitan Transit and its employees and agents for violating his First and Fourth Amendment rights pursuant to VIA Transit policy, practice, and custom. These violations

occurred once Plaintiff, a known activist to Defendants, was seen drinking a can of Coca-Cola on a public sidewalk near the VIA Centro Plaza. VIA Transit engaged in retaliatory conduct by criminally trespassing him from public sidewalks, arresting him pursuant to that unlawful trespass, and then made an unlawful request to suspend Plaintiff's concealed carry license, and then engaging in retaliatory and malicious prosecution. Each of these incidents violated Plaintiff's rights afforded to him under the United States Constitution. Plaintiff was harmed and seeks recovery in this lawsuit.

2.     VIA Metropolitan Transit, and thus VIA's Transit Police including Defendant Officers, is governed by a Board of Trustees. This 11-member Board of Trustees is a partnership between the City of San Antonio, Bexar County, and the Greater Bexar County Council of Cities (GBCCC). The GBCCC is a council comprised of the Mayors of Alamo Heights, Balcones Heights, Castle Hills, Converse, Elmendorf, Fair Oaks Ranch, Garden Ridge, Grey Forest, Helotes, Hill Country Village, Hollywood Park, Kirby, Live Oak, Lytle, Olmos Park, Sandy Oaks, Schertz, Selma, Shavano Park, St. Hedwig, Terrell Hills, Universal City, Von Ormy, and Windcrest, Texas. All three organizations appoint board members. The San Antonio City Council appoints five members, the Bexar County Commissioners Court appoints three, and the GBCCC appoints two.

3.     Plaintiff alleges that the VIA Board of Trustees ("Board") and its members, listed above, President and CEO Jeffrey C. Arndt ("Arndt"), and Chief of Police Mark Witherell ("Witherell"), (collectively referred herein as the "Policymakers") authorized a policy, practice, and custom that allowed its officers and agents to intimidate and harass Plaintiff because he is an activist, and VIA Transit considers activists to be "agitators" and not entitled to constitutional freedoms.

4.     Plaintiff further alleges that the Policymakers failed to properly train, supervise,

screen, discipline, transfer, counsel or otherwise control VIA Transit Police Officers and Security Officers who are known, or who should have been known, to engage in the use of excessive force, including those officers repeatedly accused of such acts. The Policymakers, specifically President Arndt, along with Chief of Police Witherell, had a duty, but failed to sufficiently investigate the wrongful arrests, implement and/or enforce policies, practices, and procedures for the VIA Transit Police Department that respected Plaintiff's constitutional rights. This duty was delegated to the VIA Board of Trustees who hired President Arndt to carry out the actions and policies of the council by overseeing the day-to-day operation of VIA Metropolitan Transit. Police Chief Witherell was authorized to make policies for the VIA Transit Police Department. Defendant VIA Metropolitan Transit and its Policymakers, specifically President Arndt and Chief of Police Witherell, failed to implement the necessary policies, including timely adopting a de-escalation policy and updating the use-of-force policy according to industry standards, and deprived Plaintiff of his rights under the Constitution, which caused him harm.

5.      Further, Defendant VIA Metropolitan Transit and its Policymakers, specifically President Arndt and Chief of Police Witherell, adopted policies that violate the Fourth Amendment rights of individuals expressing their First Amendment rights. Defendants Corporal Perez, Officer Lara, Security Officer Flores, Officer Sarinana, and Officer Gutierrez consciously disregarded the rights of Plaintiff, knowing that the Policymakers would not investigate the wrongful arrest and charges, and ratify and/or approve of their actions, which Chief Witherell and Policymakers did by upholding Plaintiff's criminal trespass warning and by charging Plaintiff with criminal trespassing.

6.      Plaintiff was harmed and seeks answers and compensation for his damages.

## JURISDICTION AND VENUE

7.      This is a civil rights action in which the Plaintiff seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

8.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

9.      Venue is properly laid in the Western District of Texas under 28 U.S.C. § 1391(b)(2).

10.     The events that gave rise to this lawsuit primarily took place at 8 N. Medina Street, located in downtown San Antonio, Texas, in Bexar County; and on West Travis Street, near 230 N. Medina Street, located in downtown San Antonio, Texas, in Bexar County. All other incidents occurred throughout San Antonio and Bexar County, Texas.

## PARTIES

11.     Plaintiff MARCOS RIOS ("Plaintiff") is a law-abiding citizen of the United States and a resident of the City of San Antonio, County of Bexar, State of Texas.

12.     Defendant VIA METROPOLITAN TRANSIT ("Defendant VIA") is a metropolitan transit authority created according to Article 1118x of the Texas civil statutes (superseded by Chapter 451 Texas Transportation Code) to provide public transportation services within the designated boundaries, acts under the color of law, and is a person for the purposes of a 42 U.S.C. 1983 action. Defendant's Policymakers are responsible for the policies, practices, and procedures of the VIA Metropolitan Transit Police Department and its individual officers. Defendant VIA also hires security guards from UNIVERSAL PROTECTION SERVICE, LP, a/k/a Thrive Intelligence, Allied Universal Security Services, and Allied Universal Risk Advisory and Consulting Services.

13.     Defendant CORPORAL CHRISTOPHER PEREZ (Badge #321) ("Defendant Corporal Perez") was at all pertinent times a police corporal employed by Defendant VIA and was at all pertinent times acting under color of state law in the performance of his duties as a VIA Metropolitan Transit police officer.

14.     Defendant OFFICER AMANDA LARA (Badge #353) ("Defendant Officer Lara") was at all pertinent times a police officer employed by the Defendant VIA and was at all pertinent times acting under color of state law in the performance of her duties as a VIA Metropolitan Transit police officer.

15.     Defendant OFFICER THOMAS SARINANA (Badge #381) ("Defendant Officer Sarinana") was at all pertinent times a police officer employed by Defendant VIA and was at all pertinent times acting under color of state law in the performance of his duties as a VIA Metropolitan Transit police officer.

16.     Defendant SECURITY OFFICER JOE FLORES ("Defendant Flores") was at all pertinent times a security guard employed by Defendant VIA and Universal Protection Service, LP. He was at all pertinent times acting under the color of state law in the performance of his duties as a VIA Metropolitan Transit security guard.

17.     Defendant OFFICER JOANN GUTIERREZ ("Defendant Officer Gutierrez") was at all pertinent times a police officer employed by the Defendant VIA and was at all pertinent times acting under color of state law in the performance of her duties as a VIA Metropolitan Transit police officer.

18.     Defendant UNIVERSAL PROTECTION SERVICE, LP, a/k/a Thrive Intelligence, Allied Universal Security Services, and Allied Universal Risk Advisory and Consulting Services ("Defendant Allied") is a foreign limited partnership organized under the laws of California and

authorized to do business in Texas. Defendant Allied, at all relevant times, was responsible for hiring qualified security personnel and providing adequate training to security personnel who assume roles as law enforcement officers.

19.     Each and all the acts of the individual Defendants alleged herein were committed while acting within the scope of their employment with Defendant VIA's Police Department.

20.     Each and all of the acts of individual Defendants were committed despite their knowledge that they were engaging in unlawful and unconstitutional acts, and yet they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

## STATEMENT OF FACTS

21.     This action involves policies and practices implemented by Defendant VIA and its Policymakers through the VIA Metropolitan Transit Police Department.

### A. VIA: Hometown Heroes or Harmful Harriers?


[1]

22.     Defendant VIA provides public transportation throughout San Antonio and surrounding cities in Bexar County. VIA's transportation routes cover an impressive 1,208 square miles, but it has ambitious plans to add a rapid transit option through a north-south corridor

[1] VIA Metropolitan Transit, FACEBOOK (Aug. 16, 2022),

in the middle of San Antonio.

23.     Defendant VIA also strives to be an integral part of San Antonio's community by offering connectedness, while providing services to help equalize learning and work opportunities for all San Antonians. In recent years, Defendant VIA has begun offering free Wi-Fi on all VIA buses and vans; free rides for voters on election day; and special pricing options for students in San Antonio in partnership with local schools.  When San Antonio's schools moved to distance learning during COVID-19, Defendant VIA set up high-speed Wi-Fi hotspots for their local community to use.  When the San Antonio Food Bank could not feed everyone in need during COVID-19 closures, Defendant VIA stepped in to help deliver food bank supplies as part of its VIA Cares initiative.  Defendant VIA has also partnered with Bexar County's BiblioTech, an all-digital public library, to provide equal access to the local library with kiosks at six VIA transit centers.

_____

https://www.facebook.com/VIATransit/photos/a.516049428456901/5687769307951528/?type=3&theater.

24.     One such VIA transit center is the Centro Plaza at VIA Villa, located a few blocks west from the Historic Market Square and downtown San Antonio. Centro Plaza, funded by tax dollars and a federal grant, is a state-of-the-art transit center opened in November of 2015. The transit center offers an air-conditioned waiting area, a full-service customer service center, and ticket kiosks for transit riders. As the Centro Plaza is also intended to be a "transformative community space within the Cattleman Square historic district," Centro Plaza also offers outdoor seating in a large public plaza, free Wi-Fi, public restrooms, and a BiblioTech kiosk. The Centro Chroma Tower, an art installation designed by local artist Bill FitzGibbons, offers an interactive light show.



25.     Defendant VIA also uses VIA Villa as a community gathering place. Pre-COVID-19, Defendant VIA held a yearly National Night Out event at Centro Plaza with their Transit Police. Defendant VIA has also organized a public concert by UTSA Mariachi Group Los Paisanos and hosted the San Antonio Food Bank's Mobile Mercado every Wednesday for a month at Centro Plaza. Defendant VIA, in partnership with the National Arts Program, also, pre-COVID-19, held an annual art show at The Grand, part of the VIA Villa, open for free to the public. The Grand has also been used to host a free public photo exhibit "Nuestra Gente" to celebrate Hispanic innovators.

26.     For all intents and purposes, Defendant VIA tries hard to appear as an important contributing member of the community and to present Centro Plaza as both a public transportation

center and a welcoming *public* plaza for all of San Antonio's community. The reality, unfortunately, is much, much darker.

27.     Defendant VIA publicly invites the community to use their facilities—facilities that the community has helped fund—then, when the public uses them for anything except to immediately board a bus, demands they leave.  If they do not immediately leave public property that Defendant VIA falsely claims is privately owned, individuals are assaulted, arrested, and criminally trespassed.

28.     Defendant VIA police officers have a history of cruising around town, stopping at bus stops, and asking the individuals there if they are planning to get on a bus.  Even individuals who plan to take the bus but choose not to respond to this impromptu interrogation have been handcuffed, arrested, and/or criminally trespassed by Defendant VIA's police—even handicapped individuals.[2]  Defendant VIA's custom of criminal trespassing individuals denies these residents access to some or all VIA public transportation—transportation they pay for with their own tax dollars.

---

[2] Dkt. No. 1-1; https://www.youtube.com/watch?v=qveH1QjSXdQ.



29.     Defendant VIA's policy of driving out residents who linger at VIA bus stops and transit centers continues to this day.[3]



---

[3] Dkt. No. 1-1.

30.      Plaintiff, who lives south of the downtown area, has witnessed many such encounters between VIA Transit Police and the members of his community.  As a result, when he sees VIA PD interacting with the public, Plaintiff documents these interactions.  He wants his investigative journalism to bring VIA Transit's police officers' behavior to light.  He wants to help San Antonio hold these Transit cops accountable, so they stop bullying the public. Plaintiff feels sickened by how they treat innocent people, and he wants this harassment going on in his community to stop.

31.      Plaintiff's investigative journalism has brought him to the attention of the police officers and security personnel employed by the VIA Transit Police.  While Plaintiff serves as a



cameraman for the public, he limits his interaction with the officers, and he never introduces himself to them.  He also never provides them with his YouTube Channel's name where he publicly shares these encounters.

32.      This prudent caution was ultimately insufficient to protect him.[4]

***B. VIA Shares Their Holiday Spirit***

33.      On November 24, 2021, the day before Thanksgiving, Plaintiff and his friend Daniel Tullos were downtown, walking south on N. Medina Street.  Both men used the public sidewalk on the Centro Plaza side.  The night was quiet, still, and the plaza seemed empty.

34.      At W. Houston Street, the two men crossed N. Medina Street in the crosswalk

---

[4] This image depicts injuries Plaintiff sustained during the first incident at question in this lawsuit.

before gaining the sidewalk on the other side, in front of The Grand.  They then continued walking

south on that sidewalk.  Mr. Tullos had his phone in his hand recording their walk, while Plaintiff

had his phone tucked into his shirt pocket recording.

35.     While they were walking, both men were drinking cold cans of Cherry Coke Zero

they had purchased from a local convenience station.  Temperatures that night were in the low

70's, so Plaintiff and Mr. Tullos had each wrapped their chilled pop cans in napkins and a brown

paper bag as makeshift drink koozies.

36.     Plaintiff and his friend were talking, walking, and generally having a good time,

when they heard what sounded like someone yelling.  Since there is usually a large amount of

traffic in the area, including a large homeless population, Plaintiff ignored the sound.

37.     Plaintiff's friend warned Plaintiff that Defendant VIA's police officers were

headed directly toward them at a fast-moving pace.  Plaintiff joked back that his friend needed to

run; the UFO guys were coming after him.  By UFO, Plaintiff was referring to the strange, UFO-

shaped architectural structure over N. Medina Street that is part of Defendant VIA's Centro Plaza.



38.     Suddenly VIA Police Officer, Defendant Officer Lara (Badge #353), and VIA

Security Guard, Defendant Flores (Badge #722), approached and detained Plaintiff.  All jokes and

laughter came to an end.

39.     Defendant Officer Lara had six years' experience working as a jailer, when she decided to transition over to a position as a peace officer.  She worked as a reserve peace officer for close to two months with the Webb County Constable Precinct 2's office at about the same time she moved to San Antonio and was hired on by the VIA Metropolitan Transit Police Department, on July 30, 2021.  Following this transition, the VIA PD placed Defendant Lara in a 12-week field training program supervised by field training officers.  She finished this program on November 6, 2021, with a final evaluation report completed by Field Training Officer Alan Baker on November 20, 2021, declaring Defendant Officer Lara "ready to perform her duties as a VIA Transit Police Officer."

40.     Defendant Lara and other VIA officers were not trained on de-escalation despite VIA knowing that they would regularly interact with members of the public.  They did learn about Defendant VIA's policies for targeting activists such as Plaintiff. Four days after being cleared to perform VIA police duties, Defendant Lara encountered Plaintiff Rios while stationed at VIA's Centro Plaza.

41.     Defendant Officer Lara had spotted Plaintiff and Mr. Tullos walking on the public sidewalk past her quiet nighttime post at the VIA Transit Center with their paper-bag-wrapped cans. She assumed—without investigating—that the two men, who were minding their own business and legally enjoying the freedoms provided to them as American citizens, were trying to conceal open containers of alcohol, which possession is prohibited by City Ordinance.

42.     The City Ordinance at issue, City Code § 4-4(b), prohibits the possession or consumption of any alcoholic beverage within the Central Business District.

43.     Seeing two men casually walking down a public sidewalk holding beverages in a

paper bag, this brand-new VIA Transit officer sprang into action with Security Officer Flores.

44.     First, this officer of the law tried hollering at the unsuspecting men from a distance.  When her poorly delivered verbal commands failed to provide a response from the men whom she assumed were criminals, she escalated the encounter according to VIA Transit PD's use-of-force policy and, the moment she neared the two men, grabbed Plaintiff's arm.  Rather than introduce herself as an officer or inform Plaintiff she was detaining him, Defendant Officer Lara vaguely told Plaintiff to, "Come over here."

45.     Plaintiff asked her not to touch him.  Defendant Officer Lara responded with her assumption that he was publicly drinking alcohol.  She also immediately recognized that Mr. Tullos was recording the incident and making statements about posting the information for the public to see what was occurring.

46.     Defendant Lara immediately recognized that Plaintiff and Mr. Tullos were potentially activists, or "auditors."  VIA trained her that auditors are not welcome on VIA property because of their viewpoint about VIA transit officers.  VIA failed to train her on what was objectively obvious—these people being removed from (not VIA property) are engaged in protected activity.  So, her auditor training kicked in.

47.     A little over 10 seconds after the encounter began, without giving any verbal commands, Defendants Officer Lara and Security Officer Flores used a take-down maneuver to drop Plaintiff to the ground.  Both Defendants grabbed Plaintiff's arms and used them to push him onto his knees on the asphalt street then to shove him to the ground.  Each Defendant Officer held one of Plaintiff's arms behind his back, leaving him no way to break his fall forward.



48.    Defendants caused Plaintiff's face to hit the concrete sidewalk hard, causing bruising to Plaintiff's right eye and a gash on Plaintiff's right eyebrow.  Both Defendants then forcefully handcuffed Plaintiff's wrists behind his back.  This escalation was due to a lack of

training in de-escalation by both Defendants VIA and Allied but bolstered by VIA's anti-auditor policy.

49.    Until very recently (after this incident), the VIA Metropolitan Transit Police Department lacked policies and training on de-escalation. Even though the International Association of Chiefs of Police[5] recommended a de-escalation policy by July 2020 in the *National Consensus Policy and Discussion Paper on Use of Force*, VIA PD did not adopt a de-escalation policy until June 8, 2022, months after the incidents in question in this lawsuit.

50.    TCOLE training,[6] however, which Defendant Officer Lara had received during her Basic Peace Officer Course less than a year prior, had already incorporated De-Escalation Techniques into the curriculum. Defendant Officer Lara had also received a continuing education course specifically on De-Escalation and Minimizing Use of Force a little over five months prior to this incident and about a month before she started working for VIA. Defendant Officer Lara knew better, but she also knew that VIA required her to abuse auditors.

51.    According to the *National Consensus Policy and Discussion Paper on Use of Force*, "whenever possible and appropriate, officers should utilize de-escalation techniques

[5] Association of State Criminal Investigative Agencies, Commission on Accreditation for Law Enforcement Agencies, Fraternal Order of Police, Federal Law Enforcement Officers Association, Hispanic American Police Command Officers Association, International Association of Directors of Law Enforcement Standards and Training, National Association of Police Organizations, National Association of Women Law Enforcement Executives, National Organization of Black Law Enforcement Executives & National Tactical Officers Association, *National Consensus Policy and Discussion Paper on the Use of Force* (2020), https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf.

[6] The Texas Sunset Advisory Commission reported recently that TCOLE is a regulatory approach with "a fragmented, outdated system with inadequate training, lack of statement standards, and inconsistent accountability." *Texas Commission on Law Enforcement* 1 (Sunset Advisory Commission, 2022), https://www.sunset.texas.gov/public/uploads/2022-11/Texas%20Commission%20on%20Law%20Enforcement%20Staff%20Report_11-17-22.pdf.

consistent with their training before resorting to using force or to reduce the need for force."[7] Additionally, it is recommended officers only resort to less-lethal force[8] "[i]n situations where de-escalation techniques are either ineffective or inappropriate, and there is a need to control a non-compliant or actively resistant individual."[9]

52.      Defendant Officer Lara did not attempt to use de-escalation techniques; namely, because VIA failed to train her on it.  Rather, she immediately used less-lethal force.  When Defendant Officer Lara grabbed Plaintiff, he was not actively resisting arrest.  Rather, he had been previously ignorant of her presence and any requests she had given.  This use of force lacked sufficient justification.  When Defendant Officers took Plaintiff to the ground, he again was not actively resisting or exhibiting any violent behavior.  This use of force also lacked sufficient justification.

53.      Defendant Officer Lara could have reasonably resolved this situation by approaching Plaintiff and Mr. Tullos and asking to speak with them.  Once the two men were aware of her presence, she could have introduced herself as a peace officer, asked them how their evening was going, politely mentioned that she had noticed their beverages, and asked what they were drinking.  If they declined her request, she was required to let them go as she lacked reasonable suspicion to detain them.  If they complied with her request, she would have discovered they possessed Coke cans and would have been required to let them go.

54.      Instead, Defendant Officer Lara assaulted and detained Plaintiff before even

---

[7] *National Consensus Policy and Discussion Paper on Use of Force* at 12.

[8] By definition, less-lethal force is "any use of force other than that which is considered deadly force that involves physical effort to control, restrain, or overcome the resistance of another." *Id.* at 2.

[9] *Id.* at 12.

investigating because she knew, according to VIA policy, that people who film them and post the video online are auditors, and VIA required its officers to cease their activity and remove them from VIA property and away from officers.

55.    Similarly, Defendant Security Officer Flores, a non-commissioned security officer since 2005, a commissioned security officer since 2008, and a TOPS-certified Level III Classroom Instructor since four months before this incident, could have relied on his training to diffuse the situation.  Instead, since did not receive de-escalation training from Defendants VIA and Allied, he assisted Defendant Officer Lara in violently dropping Plaintiff to the ground.

56.    Lying face down on the concrete and asphalt ground, Plaintiff again requested Defendant Officer Lara and Defendant Flores not touch him.  These Defendant Officers decided *this* request justified leaving him lying face down, half on the sidewalk, half in the street next to his spilled can of Cherry Coke Zero.  When Plaintiff told them he had hit his head on the pavement, they ignored them.  When Plaintiff requested that they loosen his handcuffs, which were cutting off the circulation in his hands, both Defendants again ignored him.  Both Defendants also refused to identify themselves.



57.    About four minutes after Plaintiff was forcefully detained, Defendant Officer Sarinana (Badge #381) arrived on the scene in his police cruiser, lights flashing.

58.    As Defendant Officer Sarinana got out of his vehicle, he asked what happened. Both Plaintiff and his friend informed him that nothing had happened. They were both ignored. Defendant Officer Sarinana then went to the side and spoke quietly with Defendant Officer Lara.



59.    Defendant Officer Sarinana, whose work Plaintiff had previously documented, agreed with Defendant Officer Lara's assessment that Plaintiff was an auditor and that Plaintiff is known to VIA for filming VIA police officers—or, as he phrased it in his police report: "an auditor (SA 210 Copwatch) who incites police interaction then becomes vulgar or disruptive."

60.     While Plaintiff does film police encounters if he witnesses them, he does not create interactions or try to interject himself into ongoing interactions.  If allowed, he quietly films from a distance.  Occasionally, he may ask questions of the officers.  Although Defendant Officer Sarinana has witnessed Plaintiff document police activity before, he chose not to treat him as an individual, but rather, per VIA policy, to lump him into a category with other individuals who film the police: auditors.

61.     As a result of an increased awareness of police brutality, society has called for greater accountability from our law enforcement officials.  This desire for accountability has resulted in individuals like Plaintiff filming police encounters.  Some of these individuals use their filming to hold police officers and deputies to a higher standard.  Others have less pure motivations. Police Chiefs, Constables, and other law enforcement leaders in the Bexar County area, particularly those belonging to the Alamo Area Police Chiefs Association, have decided that each of these individuals with their myriad motivations, goals, and actions are not independent people, but rather an organized group gathered for the sole purpose of harassing police officers, also known as "First Amendment Auditors."  Anyone they find filming police officers is treated with the same level of disdain and suspicion.

62.     Following VIA's policy to do the same, Defendant Officer Sarinana, a three-and-a-half-year veteran with the department, informed Defendant Officer Lara that VIA's departmental policy for handling these auditors required her to call an on-duty supervisor and inform them of the auditor's presence.

63.     While completing VIA PD's field officer training program, Defendant Officer Lara did not deal with "Special Interest Groups/Persons Recording Video on VIA Property" during her hands-on training.  She lacked the experience and training to make an independent judgment.

Instead, she chose to rely on Defendant Sarinana's experience and training.



     64.     Defendant Officer Lara made the call while Defendant Officer Sarinana came over and talked with Plaintiff. Defendant Officer Sarinana asked Plaintiff if he wanted to sit up. Plaintiff asked why he was in handcuffs. Defendant Officer Sarinana claimed that answering that question was not his position, because he did not place the handcuffs on Plaintiff.

     65.     Plaintiff and Mr. Tullos asked Defendant Officer Sarinana to call for a supervisor. They were informed that a supervisor was in route.

     66.     Plaintiff again asked why he was detained. He was again ignored. Defendant Officer Sarinana asked Defendant Flores if the can and spilled liquid on the ground was "it."



     67.     Plaintiff and Mr. Tullos informed Defendant Officer Sarinana that it was Cherry Coke. Defendant Officer Sarinana kicked the can slightly, read the label, and then went back to standing around.

68.    Even knowing Plaintiff had not been drinking alcohol and that Plaintiff was sober—not intoxicated as he had clearly been briefed by Defendant Officer Lara—Defendant Officer Sarinana failed to intervene and remove Plaintiff's handcuffs.



69.    Defendant Officer Sarinana saw the injuries on Plaintiff's face and failed to provide medical attention.



70.    Defendant Officer Sarinana then had another conversation with Defendant Officer Lara.  He informed her that probable cause did not exist to arrest him.  No one let him go.

71.    Eight minutes after Plaintiff had been handcuffed, not a single officer standing around had bothered to search him. Plaintiff disgusted with their clear lack of training, informed them that he was lawfully carrying a firearm on his hip.  No one searched him or removed his weapon.

72.    Defendant Officer Lara attempted to interrogate Plaintiff.  Plaintiff refused to answer any questions without an attorney present.

73.    Another VIA patrol cruiser arrived on site two minutes later.  Through the radio, the officer inside asked if the area was secure.  Plaintiff shouted that he was scared.  Ignoring Plaintiff, Officer Lance Solari (Badge #378) joined the other VIA officers on scene.

74.    Officer Lance Solari had been one of Defendant Officer Lara's field training officers during her initial training.  He oversaw her actions and provided instructions during Phase

3 of her training.[10]

75.    He and the other officer he had arrived with, Officer Juan Gonzalez (Badge #379),

began putting on gloves. When asked why

they felt the need for gloves, both officers

ignored Plaintiff. Instead, they went to the

side and spoke with Defendant Officer Lara

about charging Plaintiff with disorderly

conduct—an entirely different charge from



public intoxication. Mr. Tullos, overhearing this conversation, informed them that they could not

charge Plaintiff with disorderly conduct for speech alone. This conversation ended shortly after

that.

76.    In his police report, Officer Gonzalez reported this conversation differently in his

supplemental report. He wrote that the "two officers on scene, [Defendant Officers Lara and

Sarinana], confronted me and informed me of the incident and what led to the adult male in

handcuffs. Once informing me, I, [sic] instructed them to wait for a supervisor and to not do

anything any further as it might hinder the investigation." Even though Officer Gonzalez knew

that Plaintiff had committed no crimes, he did not intervene to remove Plaintiff's handcuffs or to

release him from detainment. Rather, he relied on VIA's unconstitutional policy of detaining

individuals who express their First Amendment right to film the cops after no reasonable suspicion

or probable cause exists to continue the detainment.

77.    Officers Solari and Gonzalez then joined the other officers in standing around.

None of them moved to investigate the situation. None of them released Plaintiff from his

---

[10] Per the VIA Metropolitan Transit Police Field Training Program *Training Manual*, Phases 1-3
are progressive four-week long training tiers, followed by a one-week long evaluation (Phase 4).

handcuffs.

78.     Officers Solari and Officer Gonzalez knew better. Both were TCOLE-trained officers who had passed the Basic Peace Officer Course. Officer Solari and Officer Gonzalez had also both previously received training on "Arrest, Search, and Seizure (Intermediate)" and "Civilian Interaction Training" in 2019, and "Mechanics of Arrest & Search" and "Patrol Procedures" in 2020. Officer Solari was also a field training officer who had passed the TCOLE Field Training Officer Course. Consistent with VIA's anti-auditor policy, neither officer moved to intervene and release Plaintiff even though he was being held in violation of his Fourth Amendment rights.

79.     At about twelve-and-a-half minutes after Plaintiff was placed in handcuffs, a final

 police cruiser arrived on scene. Defendant Officer Lara and Officer Sarinana approached the officer and spoke with him before all three walked back over to Plaintiff and Mr. Tullos. When asked, this new arrival identified himself as Defendant Corporal Perez (Badge #321).

80.     Unbeknownst to Plaintiff and Mr. Tullos, the entirety of Defendant Corporal Perez's investigation of the scene involved him listening to his officers' excuses for the situation and asking them two questions: (1) "[I]f they felt this was a baited situation to get a reaction from the police," and (2) "if they had any crimes to charge the individual with." The officers answered affirmatively to the first and negatively to the second. Defendant Corporal Perez did not conduct any further investigation, nor did he immediately demand Plaintiff's release.

81.    Defendant    Corporal
Perez, a TCOLE certified Advanced Peace
Officer with twelve years of experience,
approached Plaintiff and asked him why he
was in handcuffs.  Plaintiff, who hoped a
supervisor would be better trained, told
Defendant Corporal Perez that he needed



to ask Defendant Officer Lara because she had handcuffed him.

82.    Without investigating the empty pop can lying in the street or Plaintiff's level of
sobriety, without even asking Plaintiff for his side of the story, Defendant Corporal Perez told
Plaintiff that he was in handcuffs because he appeared to be intoxicated.

83.    When Plaintiff, who knew that he was not intoxicated, challenged Defendant
Corporal Perez to book him for intoxication, Defendant Corporal Perez stressed that he was
accusing Plaintiff of attempting to look like he was intoxicated—not actual intoxication.

84.    According to Defendant Corporal Perez, the highest-ranked and best-trained
officer present at the scene; Plaintiff—who had been walking down a public sidewalk minding his
own business nowhere near the VIA police officers stationed at Centro Plaza—was actually at
Centro Plaza for the sole purpose of attempting to get a reaction from the police.

85.    Defendant Corporal Perez informed Plaintiff, who was handcuffed and lying in
the street with a gash on his forehead and a bruised eye, that he got exactly what he was looking
for—a police interaction.

86.    When Mr. Tullos asked about officers first investigating, Defendant Corporal
Perez told Mr. Tullos that the investigation was going on right now.  When Mr. Tullos told

Defendant Corporal Perez that Plaintiff had been taken straight to the ground without any prior investigation, Defendant Corporal Perez agreed that there was no argument there.

87.    Defendant Corporal Perez then turned back to Plaintiff and matter-of-factly told him that his presence was not welcome there.  According to VIA Transit PD's custom, practice, and policy, he told Plaintiff—a local San Antonio resident who pays taxes that fund VIA the same as any other San Antonio resident—to not come back to any VIA location or to the Centro Plaza



facility.

88.    When Plaintiff and Mr. Tullos tried to argue that Plaintiff was on city property—not VIA property— Defendant Corporal Perez tried to claim that he understood. He then attempted to falsely claim that Plaintiff was allowed on public city property, but that VIA property— paid for by local taxes and federal grants both—was private property.

89.    This banning of Plaintiff from VIA property was accomplished with a criminal trespass warning.

90.    According to VIA Transit PD's Standard Operating Procedures, Section 503 on 'Criminal Trespass Warnings and Arrests,' individuals should be warned and given time to leave the property before being criminally trespassed. The policy includes one exception, in which officers can criminally trespass individuals without providing them the opportunity to leave first: "There are instances and circumstances where the officer believes the individual's actions are more hazardous in nature that the individual is given Verbal notice to leave and not allowed to return. In these instances, the officer issues a Criminal Trespass warning to the individual."

91.     Plaintiff—who was not on VIA property at the time of his seizure—was not provided the opportunity to comply with orders to leave (city) property.  Rather, per VIA's custom Defendant Corporal Perez criminally trespassed him as he would any auditor: without providing that option.

92.     Different officers described this policy in their reports, as applied to Plaintiff. According to Defendant Officer Lara, Plaintiff received a criminal trespass warning (CTW) "due to him attempting to incite a negative police interaction with the purpose of causing a disturbance."  Defendant Officer Sarinana held a similar opinion.  Officer Gonzalez rationalized the CTW in his report by arguing that Plaintiff "was trying to bait the police" and as a result "[took] away police service from the public." Defendant Officer Perez did not offer any justification for criminally trespassing Plaintiff beyond his prior determination that Plaintiff had baited the police and received the reaction he wanted.

93.     According to their own Standard Operating Procedures, VIA's policy of trespassing auditors without first giving them the option to comply with an order to leave the property demonstrates VIA's belief that the very presence of individuals who express their First Amendment rights is "hazardous in nature."

94.     After issuing a CTW, Defendant Corporal Perez tried to unlawfully order Plaintiff to identify himself.  Plaintiff informed him that, since he was not under arrest, he did not have to identify himself. Defendant Corporal Perez, who understood Plaintiff did not have to identify himself, ordered one of his officers to take a picture of Plaintiff so they could criminally trespass him as a John Doe.

95.     Defendant Corporal Perez then ordered Defendant Officer Lara to release him.

96.     Defendant Officer Lara, with the help of another officer, removed Plaintiff's handcuffs.  The officers then all left the scene.



97.     When Plaintiff and Mr. Tullos attempted to return to the nearby parking lot by walking past Centro Plaza, Defendant Corporal Perez returned to the scene and informed Plaintiff that he could not walk down the public street on the public sidewalk—even to return to his vehicle parked several blocks over.

98.    Defendant Corporal Perez claimed that Defendant VIA maintained all the concreted roadway surrounding Centro Plaza. Only the asphalt roads were public roads.  Defendant Corporal Perez made Plaintiff walk several blocks around Centro Plaza to get back to the parking lot where his car was parked.



99.    In his report, Defendant Corporal Perez tried to claim that he asked Plaintiff to walk around the grounds of Centro Plaza because he "did not want him to be in a situation where he would be arrested."

100.    Defendant Corporal Perez knew better.  An Advanced Peace Officer with 12 years of experience, he received 40 hours of training on "Patrol Procedures" in 2013 with an hour refresher course in 2020, and a "Directed Patrol" class in 2016 for 4 hours.  He covered "Arrest, Search, & Seizure (Intermediate)" for 24 hours in 2017, along with 32 hours of "Crime Scene Investigation (Intermediate)" in 2018.  He also received "Leadership Styles" training for 7 hours in 2013, "Civilian Interaction Training" for 2 hours in 2019, and 1 hour of "PoliceOne- Police Officer Anti-Bias Training" in 2019.  When you arrive on the scene and your officers inform you that they made a mistake and violently detained someone who had not committed a crime and then left him lying on the ground handcuffed after discovering that fact, you do not blame the victim for their mistake; you hold your officers accountable.

101.    Defendant Corporal Perez, instead of relying on his training, knowledge, and experience, used VIA's policy of treating individuals who exercise their First Amendment right to film the police like criminals to blame Plaintiff for the events that had occurred.

102.    According to Defendants: Plaintiff, who had been minding his own business while enjoying time spent with a friend, wanted to be attacked by police officers, wanted to have his

head banged against the concrete sidewalk leaving a scar, and wanted to be detained in handcuffs. Why?  Because, although Defendant Officer Lara had a mere hunch he was intoxicated or publicly drinking an open container of alcohol without investigating, according to VIA policy, as Defendant Corporal Perez wrote in his supplemental report, Plaintiff is an auditor who "baited a response from the police, and this was the response he got."

103.    Defendant Corporal Perez also knew better, no matter what VIA's policy is on the matter than to criminally trespass an innocent civilian, Plaintiff, purely because Defendant Officers wrongly assaulted him and because he is known to exercise his First Amendment rights.

*C. Aftermath and Lingering Consequences*

104.    When Plaintiff finally made it home, his wife, a nurse with Baptist Health Systems, cleaned and treated the gash on his eyebrow.  Even with proper medical treatment, the gash healed into raised scars clearly visible on the edge of Plaintiff's eyebrow.  This permanent disfigurement is a direct result of the excessive force used against him.

105.    Following this interaction with Defendant VIA's police, Plaintiff remained uncertain if he had been warned to stay away from Defendant VIA's property or actually given a criminal trespass warning.

106.    Besides the matter of Defendant VIA—a government agency—potentially banning Plaintiff from both public property and San Antonio's only public transportation system, Plaintiff had to worry about the infeasibility—and the vagueness—of his being permanently banned from VIA locations.

107.    Plaintiff lives just south of downtown near Concepcion Park.  There are nine VIA bus stops in his neighborhood alone, two within a block of his house.  Defendant Corporal Perez did not provide Plaintiff with a paper detailing the exact locations he was banning Plaintiff from,

nor did he ever explain to Plaintiff whether he could now be arrested for walking down his own street. He did not give Plaintiff a way to challenge the criminal trespass warning, nor did he provide an expiration date for Plaintiff's supposed ban from San Antonio's public transportation system.

108.    Since Plaintiff had not received any of the officer's names, an incident card, an incident number, or any other document to prove an actual physical report had been made of the verbal retraction of his welcome with Defendant VIA, Plaintiff concluded that he must not have been criminally trespassed.

109.    While Plaintiff was recovering from his injuries and the shock of the incident, Defendant Officers were busy trying to justify their actions. Defendant Officer Lara's police report is full of falsities and inaccuracies from the route Plaintiff and Mr. Tullos took walking down the street to the behavior they exhibited. Interesting statements like, "it was evident that they had no intentions in utilizing the public transit system," are also included. Defendant Officer Sarinana lied too, claiming that Plaintiff is "an auditor (SA 210 Copwatch) who incites police interaction then becomes vulgar or disruptive" even though he has personal knowledge to the contrary; he also throws unfounded and knowingly false allegations in his report, such as "[t]he alleged cherry coke was placed inside a brown bag to simulate the appearance of carrying a concealed alcoholic beverage." Defendant Corporal Perez freely admits in his report narrative that he did not investigate the scene, only spoke with his officers, and made sweeping assumptions, like "I told him he is not intoxicated but it appeared like he was." Defendant Officer Solari tried to limit the number of details in his report as much as possible, but he falsely claimed that Plaintiff "was yelling and acting in an aggressive manner" while in custody. Defendant Officer Gonzalez kept his report short, but he relied heavily on VIA's unconstitutional policies to justify the sequence of

events that occurred.

110.    Supervisory officers Joel Contreras and Daniel Martinez reviewed these police reports and supplemental reports.  Upon information and belief, because of the lies and inaccuracies contained within, the reports were approved in accordance with VIA's substandard policies, and the CTW was recorded in the system.  Plaintiff's legal name was added to the CTW on November 26, 2021.

### D. Continued & Increased Retaliation

111.    Over three months later, on March 8, 2022, at about 7:45 PM, Plaintiff returned to Centro Plaza.  Having previously shared his traumatizing experience with his YouTube channel, he wanted to do a follow-up vlog post on Defendant VIA's police officers and security guards.

112.    The day before, Plaintiff had received information detailing what property belonged to Defendant VIA and what property was public property belonging to San Antonio— VIA does not own the concrete roads as Defendant Corporal Perez claimed; they belong to San Antonio.

113.    When Plaintiff approached Centro Plaza, he made certain to stay on the public sidewalks only.

114.    When Plaintiff walked past one of the darkened buildings at Centro Plaza, he noticed several police officers hiding inside with the blinds down and the lights off instead of patrolling the area.  He paused to film the officers.

115.    While he filmed them, Defendant Officer Joann Gutierrez stepped outside and ordered Plaintiff against the wall.  When Plaintiff asked, "Why?" Defendant Officer Gutierrez responded that Plaintiff has a CTW (Criminal Trespass Warning) and that he was on their property. Plaintiff tried to inform Defendant Officer Gutierrez that the sidewalk belonged to San Antonio,

not Defendant VIA.  Defendant Officer Gutierrez refused to listen.

116.    Defendant Officer Gutierrez, as a direct retaliation against Plaintiff's First Amendment right to film police officers, and in accordance with VIA's anti-auditor policy, seized Plaintiff's recording device and turned it off, and then handcuffed Plaintiff.

117.    Defendant Gutierrez then moved Plaintiff to the back of a patrol vehicle and put the safety belt on him.

118.    After Defendant Officer Gutierrez slammed the patrol car door shut, she joined two other officers standing nearby. They exchanged a round of excited high-fives.

119.    From the patrol car, Plaintiff could hear Defendant Officer Gutierrez inform the two other VIA police officers that she was not sure if it was "him," because she had not identified him yet.  She encouraged them to get the body cam so they could verify they had actually arrested the right person.

120.    While this was happening, another VIA Transit Police cruiser pulled up.  An officer jumped out and hurried over to Defendant Officer Gutierrez and whispered something to her.

121.    Immediately, Defendant Officer Gutierrez hurried back over, opened the door of the patrol vehicle, and asked Plaintiff if he was armed.  Plaintiff told her firmly that he does not answer questions.  She slammed the door again and then called her supervisor to let him know that she had "one" detained and he was armed.  Defendant Officer Gutierrez never explained to Plaintiff what he was supposedly "one" of.

122.    Within five minutes, Defendant Corporal Perez, the supervisor on duty, arrived on the scene.  Plaintiff was hastily removed from the back of the police vehicle, so the officers could pat him down.  They confiscated his lawfully concealed handgun and took his wallet.

123.    Defendant Officers then used Plaintiff's driver's license in his wallet to identify him.  Defendant Corporal Perez confirmed that Plaintiff was "one of them."  Upon information and belief, Defendant Corporal Perez meant either that Plaintiff was an auditor or that he was an auditor whom they had criminally trespassed.

124.    Defendant VIA's police officers transported Plaintiff downtown where he was booked into the Bexar County Jail on the charge of Criminal Trespass on Private Property.  Even though Defendant VIA's officers knew that Plaintiff was standing on property owned by San Antonio, not Defendant VIA, they still maliciously arrested him; even though Defendant VIA's officers knew that Defendant VIA and San Antonio's property was public not private, they still maliciously charged Plaintiff with trespassing on private property.[11]  Plaintiff lost 18 hours of his time waiting in the Bexar County Jail to bond out on a PR Bond.

125.    While Plaintiff was in jail, Defendant VIA's police officers decided this situation called for increased intimidation tactics.

126.    Following his arrest and ride downtown, Plaintiff's wife arrived to pick up his vehicle.  She unlocked Plaintiff's vehicle—parked near Centro Plaza—using the door code and started to drive home.

127.    Defendant VIA's officers followed her in two patrol cars.  When Plaintiff's wife noticed the vehicles following her down the highway and into her neighborhood, she started to panic.

128.    Instead of driving home, she drove around the neighborhood and nearby Concepcion Park.  Defendant VIA's officers continued following. Terrified at this point, she called a family friend, who was in Houston on a business trip that day, wanting to know what she should

_____

[11] This charge terminated in Plaintiff's favor.

do.  He advised her to pull over in a parking lot.  When she parked in the parking lot, the VIA officers pulled in and parked as well.

129.    The family friend called Defendant VIA's Emergency Safety and Security number and spoke with the supervisor to inform him of the situation.  The supervisor informed the family friend that VIA Transit Police had no radio calls in the area, so there was no legitimate reason for any officers to be there.  The supervisor agreed to pull out any officers that might be in the area. The family friend called Plaintiff's wife back and advised her that it was safe for her to drive home. After a bit, the VIA officers stopped following her.  Still scared, she drove around a little while longer, before finally driving home.

130.    The family friend picked Plaintiff up from the jail and revealed that Defendant VIA's police had used intimidation tactics to badly scare Plaintiff's wife while Plaintiff was in jail, unable to protect her or to comfort her.

131.    Since this was the second time Defendant VIA's police officers—while acting in their official capacity—had used their time and resources to harass Plaintiff and his family—and been reported to a supervisor for doing so—none of them knew whether this threatening behavior would continue.

132.    Accordingly, Plaintiff's family friend accompanied Plaintiff and his wife while they collected Plaintiff's belongings from VIA police.  Since Plaintiff had been criminally trespassed, Defendant VIA provided permission for Plaintiff to enter their property to sign for his personal possessions.

133.    During this visit, Plaintiff also received the report numbers for his two incidents with VIA police at Centro Plaza and clarification on the extent of his criminal trespass.

134.    Per Defendant VIA's officer Sergeant Martinez, Plaintiff cannot visit, even to change buses, VIA's Centro Plaza or visit The Grand, a nearby building also included with Centro Plaza in VIA Villa, but he is allowed on other VIA properties and on San Antonio's public transportation system. This criminal trespass lasted for a year.

135.    In addition to this year-long criminal trespass, Plaintiff faced retaliatory prosecution following these incidents.

136.    Defendants knew that Plaintiff was not on VIA property when they criminally trespassed him according to VIA Transit PD custom, when they illegally arrested him for criminally trespassing, or when they charged Plaintiff with Criminal Trespass on Private Property.

137.    For this falsified criminal trespass charge, Plaintiff was required to report every Tuesday at 9 AM to his bail bond officer, and he had to make court appearances.  He was also limited in how far he could travel.  This impacted Plaintiff's plumbing business and his ability to exercise his First Amendment rights to record VIA police officers performing public functions.

138.    Defendant VIA and its agents continued their retaliatory harassment of Plaintiff. Plaintiff received a letter in the mail sent on March 15, 2022, from the Texas Department of Public Safety notifying him that his concealed carry license has been suspended.  Defendant VIA submitted a formal request to suspend Plaintiff's concealed carry license considering his then pending Criminal Trespass charge.  Defendants knew that Plaintiff had a history of carrying weapons on his person for his own protection, and they purposefully used their official capacity as police officers in Texas to abuse a legitimate process in order to exact retribution—presumably out of their embarrassment over videos now publicly available online that show their officers failing to secure Plaintiff's weapon after he was in handcuffs.

139.    On May 19, 2022, the retaliatory prosecution terminated in Plaintiff's favor. Unfortunately, Plaintiff was already harmed.

140.    Defendant Officer Lara and Defendant Flores, employees of Defendant VIA's Transit Police Department, falsely detained and ruthlessly attacked Plaintiff—an attack which caused permanent scarring.

141.    Defendants violated Plaintiff's constitutional rights and caused him harm.

### CAUSES OF ACTION ARISING FROM NOVEMBER 24, 2021

#### COUNT I
#### FOURTH AMENDMENT AND 42 U.S.C. § 1983
#### (Violation of Fourth Amendment Rights – Unlawful Seizure)

142.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

143.    Plaintiff asserts this claim against Defendants Lara and Flores.

144.    Defendants Officer Lara and Security Officer Flores acted under the color of law when they seized Plaintiff on November 24, 2021.

145.    Defendants were without any lawful authority to seize Plaintiff.  Walking down a public sidewalk with a beverage in a paper bag does not provide specific, articulable facts of criminal activity to support the initial detention of Plaintiff.

146.    Even if Defendants had reasonable suspicion to briefly detain him (which they did not), they were required to act with prudence to dispel or confirm their suspicions.  Within seconds, the Defendants observed that the beverage inside the paper bag was a Coke, so they were required to immediately release Plaintiff.  They failed to do so.

147.    Defendants acted intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently when they unlawfully seized and continued to seize Plaintiff.

148.    As a direct and proximate result of Defendant Lara's and Flores' unlawful actions, Plaintiff was harmed and suffered damages.

## COUNT II
## FIRST AMENDMENT AND 42 U.S.C. § 1983
## (Violation of First Amendment Rights – Retaliatory Seizure)

149.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

150.    Plaintiff asserts this claim against Defendants Lara, Flores, Sarinana, and Perez.

151.    These Defendants acted under the color of law when they seized Plaintiff on November 24, 2021.

152.    Defendants extended the seizure and criminally trespassed Plaintiff because they considered him a person who exercises First Amendment conduct by filming VIA Transit police officers (a First Amendment Auditor).  The Defendants' actions would chill a person of ordinary firmness from continuing to engage in that activity.

153.    The Defendants continued their unlawful seizure and criminally trespassed Plaintiff solely because of his First Amendment activity.  They were without any lawful authority to carry out their conduct as it was substantially motivated against his exercise of constitutionally protected conduct.

154.    Defendants acted intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently when they unlawfully retaliated against Plaintiff.

155.    As a direct and proximate result of the Defendants' unlawful actions, Plaintiff was harmed and suffered damages.  In the alternative, Plaintiff seeks nominal damages for the First Amendment violation.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Excessive Force)

156.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

157.    Plaintiff asserts this claim against Defendants Lara and Flores.

158.    On November 24, 2021, Defendants Officer Lara and Security Officer Flores, acting under the color of law, violated Plaintiff's constitutionally protected rights. These violations include the right to be free from excessive force.

159.    Defendants Lara and Flores used of force that was objectively unreasonable when they forced Plaintiff's head to hit the cement ground.  These Defendants knew that Plaintiff had not committed any crime and was not resisting or fleeing.

160.    Plaintiff suffered permanent disfigurement due to these Defendants' force that was clearly excessive and objectively unreasonable

161.    Plaintiff never exhibited any signs of violence or resistance, nor did Defendants Lara and Flores have any lawful basis to believe Plaintiff was violent.  These Defendants were not in a high-pressure situation that would require split-second decisions to be made.  Rather, these Defendants recognized that Plaintiff was someone that engages in First Amendment activity to the dismay of VIA and in violation of VIA policy.

162.    At all relevant times Defendants Lara and Flores intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently used excessive force on Plaintiff.

163.    As a direct and proximate result of Defendant Lara's and Flores' unlawful actions, Plaintiff was harmed.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (Fourteenth Amendment – Failure to Provide Medical Care)

164.     Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs. At all times relevant herein, Defendants were acting under color of State law.

165.     Plaintiff asserts this claim against Defendants Lara, Flores, Sarinana, and Perez.

166.     The Fourteenth Amendment to the United States Constitution requires state officials to provide medical care to an individual injured in their custody.

167.     As discussed herein, Plaintiff was physically injured by the unreasonable force used by Defendants Lara and Flores on November 24, 2021.

168.     Defendants Lara, Flores, Perez, and Sarinana all recognized that Plaintiff was injured while in their custody given his bloodied face and complaints, but they failed to act.

169.     These Defendants were motivated by their ill-will toward Plaintiff to not provide first aid to him or to call paramedics.

170.     Defendants' failure to act resulted in Plaintiff's treatment being delayed which contributed to a worsened scarring of his face.

171.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered harm and seeks damages.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (Supervisory Liability)

172.     Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

173.     Plaintiff asserts this claim against Defendant Perez.

174.    At all relevant times Defendant Perez was acting under the color of state law.

175.    On November 24, 2021, Defendant Perez recognized that Defendants Lara and Flores unlawfully extended the seizure of the handcuffed Plaintiff and caused him injury.  Rather than intervening to prevent further harm, Defendant Perez affirmatively participated in the unlawful seizure by concluding that Plaintiff is a First Amendment Auditor and desired to a police interaction.  When he arrived on the scene, he took charge and made the decision to keep the Plaintiff handcuffed and under his control despite lacking any lawful authority.

176.    Defendant Perez acted with deliberate indifference to the rights of Plaintiff when he affirmatively decided to continue Plaintiff's seizure.

177.    At all relevant times, Defendant Perez intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently allowed one another to continue to violate Plaintiff's constitutional and statutory rights to be free from unlawful arrest and excessive force, and to be entitled to prompt medical care.

178.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff suffered harm and seeks damages.

### CAUSES OF ACTION ARISING FROM MARCH 8, 2022

### COUNT VI
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (First Amendment – Retaliatory Arrest and Prosecution)

179.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

180.    Plaintiff asserts this cause of action against Defendants Perez and Gutierrez.

181.    At all times relevant, Defendants Perez and Gutierrez were acting under color of State law and in accordance with VIA Policy.

182.    Defendants Perez and Gutierrez unlawfully seized and arrested Plaintiff despite lacking any probable cause that he committed a crime.  These Defendants then pursued charges against Plaintiff despite knowing there was not any probable cause or lawful authority to do so.

183.    The arrest and prosecution were unsupported by probable cause and were made in retaliation for protected speech since they knew that Plaintiff exercised First Amendment activities by filming VIA transit officers performing public duties.

184.    On March 8, 2022, Plaintiff was filming VIA police officers from the public sidewalk—a First Amendment activity.  Defendant Gutierrez unlawfully seized Plaintiff and stopped his recording by claiming that he violated a criminal trespass warning despite being on public property and not on VIA property.  She then proceeded to high-five other VIA officers.

185.    Defendant Perez, the supervisor, agreed with the seizure and authorized the arrest.

186.    Defendants knew that Plaintiff was not on VIA property and that they lacked probable cause but they arrested him anyway.

187.    Defendants continued their retaliation by seizing his firearm, following his wife around, causing his weapons permit to be suspended, and then by initiating prosecution.

188.    Defendants' conduct caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity.

189.    Defendants' conduct was motivated because of Plaintiff's First Amendment activity as well as VIA policy which prohibited Plaintiff's protected activity.

190.    Plaintiff would not have been arrested or prosecuted but for the Defendants' animosity against him for engaging in his protected activity.

191.    Defendants acted intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently when they unlawfully retaliated against Plaintiff.

192.    As a direct and proximate result of the Defendants' unlawful actions, Plaintiff was harmed and suffered damages.  In the alternative, Plaintiff seeks nominal damages for the First Amendment violation.

## COUNT VII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Arrest)

193.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

194.    Plaintiff asserts this cause of action against Defendants Perez and Gutierrez.

195.    At all times relevant, Defendants Perez and Gutierrez were acting under color of State law and in accordance with VIA Policy.

196.    Defendants arrested Plaintiff for violating an alleged criminal trespass warning to not be on VIA property.  Defendants knew that Plaintiff was not on any VIA-controlled property.

197.    Defendants knew they lacked the authority to provide Plaintiff with statutory notice that he was not permitted to be on a public sidewalk.  Defendants knew that Plaintiff was not committing any crime.  The only information they had was that they knew he filmed VIA police officers, and they considered his protected conduct offensive.

198.    Defendants acted intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently when they unlawfully retaliated against Plaintiff.

199.    As a direct and proximate result of the Defendants' unlawful actions, Plaintiff was harmed and suffered damages.

## COUNT VIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Search and Seizure)

200.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

201.    Plaintiff asserts this cause of action against Defendants Perez and Gutierrez.

202.    At all times relevant, Defendants Perez and Gutierrez were acting under color of State law and in accordance with VIA Policy.

203.    Defendants unlawfully searched and seized Plaintiff's handgun in violation of his Fourth Amendment rights.

204.    Since Plaintiff's arrest was unlawful, the corresponding search and seizure were also unlawful.

205.    Defendants' disarmament of Plaintiff was not due to any safety concerns as they did not immediately take Plaintiff's firearm.  They only removed his firearm after Defendant Guiterrez stopped high fiving the other officers.

206.    Defendants acted intentionally, knowingly, maliciously, recklessly, unreasonably, and/or grossly negligently when they unlawfully searched Plaintiff and deprived him of his firearm.

207.    As a direct and proximate result of the Defendants' unlawful actions, Plaintiff was harmed and suffered damages.

## CAUSES OF ACTION AGAINST UNIVERSAL PROTECTION SERVICE, LP

### COUNT IX
### STATE CLAIM – NEGLIGENT HIRING, SUPERVISION, TRAINING, AND RETENTION

208.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

209.    Plaintiff asserts this cause of action against Defendant Allied.

210.    Defendant Allied knew that it was required to hire competent and fit employees who would be interacting with members of the public with the privilege of restricting their liberties.

211.    Defendant Allied hired Defendant Flores despite knowing that he was incompetent or unfit to carry out the role of a security officer who would have the authority to detain and arrest members of the public.

212.    Defendant Allied failed to adequately train Defendant Flores in de-escalation, first aid, and in respecting Plaintiff's constitutional rights while exercising any privilege in restricting the liberties of citizens.

213.    Defendant Allied failed to supervise Defendant Flores.  Defendant Allied knew or should have known of VIA's unconstitutional policy toward individuals who film police. However, Defendant Allied allowed Defendant Flores to engage in wrongful activity by authorizing him to make unlawful seizures of individuals who were not committing crimes, including Plaintiff.

214.    Plaintiff was injured due to Defendant Allied's negligence in hiring, training, and supervising Defendant Flores.  Plaintiff seeks to recover damages from Defendant Allied.

## COUNT X
## STATE CLAIM – RESPONDEAT SUPERIOR

215.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

216.    Plaintiff asserts this cause of action against Defendant Allied.

217.    Defendant Allied was responsible for Defendant Flores, who was acting in the course and scope of his employment when he unlawfully seized and assaulted Plaintiff, and then failed to render aid, on November 24, 2021.

218.    Plaintiff was injured because of Defendant Flores.  Plaintiff seeks to recover damages from Defendant Allied.

## CAUSES OF ACTION AGAINST VIA METROPOLITAN TRANSIT

## COUNT XI
## *MONELL* LIABILITY

219.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

220.    Defendant VIA, through its Policymakers, knew that its officers would interact with members of the public, and as part of those interactions, would need to recognize the First and Fourth Amendment rights of Plaintiff.  Defendant VIA, through its Policymakers, also knew that its officers would need to use force and that prior to using force, there should be de-escalation.

221.    Defendant VIA failed to have *any* training policy whatsoever concerning Plaintiff's constitutional right to film police performing public functions.  To the contrary.  Defendant VIA has a practice and custom of unlawfully seizing individuals that film them, and then trespassing them from public spaces not owned or controlled by VIA.  Defendant VIA and its Policymakers knew that without implementing any training policies concerning this First Amendment right its

officers would violate Plaintiff's First Amendment right, and that is precisely what happened.

222.    Defendant VIA failed to have *any* training policy whatsoever concerning de-escalation.  Defendant VIA knew that it was foreseeable that its officers might use force when interacting with members of the public, and that the force used was required to be measured and objectively reasonable.  Defendant VIA knew that by failing to implement any training policy in de-escalation its officers would and did violate Plaintiff's Fourth Amendment right to be free from excessive force.

223.    Had Defendant VIA, through its Policymakers, implemented *any* training policy concerning Plaintiff's First and Fourth Amendment rights, then its officers would not have unlawfully seized, assaulted, or retaliated against Plaintiff.

224.    Defendant VIA fails to discipline its officers for violating Plaintiff's rights.  Instead, it has a pattern and practice of *rewarding* its officers based on the number of criminal trespass warnings given without regard to whether these warnings were given with lawful authority or if it was given as a measure to silence individuals like and including Plaintiff from exercising First Amendment rights.  Defendant VIA has a practice and custom of using criminal trespass warnings to remove people it does not want in the public square—including homeless people and activists. Here is one such review from Defendant VIA measuring performance based on criminally trespassing citizens:



Most Acceptable Performances: ███████ ISSUED A TOTAL OF 5 CRIMINAL TRESPASS WARNINGS IN A DAY. HE WAS ABLE TO IDENTIFY INDIVIDUALS NOT UTILIZING THE TRANSIT SYSTEM AND BAN THEM FROM THEIR RESPECTIVE PORTIONS OF THE TRANSIT SYSTEM. ██████ HAS SHOWN HE IS FAMILIARIZING HIMSELF WITH INVOLVED PAPERWORK.

Criminal Trespass warnings:

☑YES ☐No   Explanation: *Has 7 CTW cases by end of 2nd Phase, all w/th multiple suspects.*

225.    It is through this practice of rewarding the removal of individuals, especially "auditors" that put Defendant VIA on notice that its officers would violate Plaintiff's rights.

226.    Defendant VIA also has a practice of not reporting interactions with "auditors." Despite Defendants assaulting Plaintiff and causing an obvious head injury, Defendants were not obligated to—and did not—report the use of force incident because of Plaintiff's perceived status.[12]  None of the use-of-force incidents actually reported pertain to a single interaction with auditors despite having a widespread practice of removing "auditors" from any location (regardless of whether VIA has any ownership interest) through the use of force.

227.    Defendant VIA's practice of *rewarding* rather than disciplining its officers made it foreseeable that its officers would continue to unlawfully seize and use force on perceived "auditors" without fear of reporting, investigation, or discipline.  Had Defendant VIA instilled a practice of reporting *all* use of force incidents, then the individual Defendants would have ended their practice long before interacting with Plaintiff.

## DAMAGES

228.    **Actual damages**.  Defendants' acts or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiff, and Defendants should be held jointly and severally liable for the physical injuries, mental anguish, emotional distress, loss of potential income, disfigurement, medical treatment, pain and suffering, and reimbursement of one Cherry Coke.

229.    **Punitive/Exemplary Damages against individual defendants in their individual capacities**.  Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

---

[12] Dkt. No. 1-2.

indifference to the federally protected rights of others.

230.    **Nominal damages** for First Amendment violations.

231.    Prejudgment and post judgment interest.

232.    Costs of court.

233.    Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

234.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the court.

## JURY DEMAND

235.    Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiff have and recover judgment from Defendants actual and nominal damages, exemplary and punitive damages, pre-judgment interest at the legal rate; interest on the judgment at the legal rate; costs of court; attorney fees; and any other relief, both general and special, in law and equity, to which Plaintiff is justly entitled.

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Attorney-in-Charge
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFF**