**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MARCOS RIOS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. SA-23-CV-1310-KC** |
| | § | |
| **CORPORAL CHRISTOPHER** | § | |
| **PEREZ, et al,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION**

On August 7, 2024, Defendants filed their Motion to Dismiss Plaintiff's Second

Amended Complaint ("Motion"), ECF No. 34. On March 31, 2025, the Court granted the

Motion with a memorandum opinion to follow. Mar. 31, 2025, Text Order. The Court now

issues its opinion.

**I.    BACKGROUND**

Plaintiff Marcos Rios alleges that the VIA Metropolitan Transit Police Department

("VMTPD") is responsible for its officers' actions in unlawfully detaining him in two separate

incidents that occurred in November 2021 and March 2022, in San Antonio, Texas. *See*

*generally* 2d Am. Compl., ECF No. 31. The following facts are derived from the allegations in

Rios's Second Amended Complaint and are taken as true for purposes of adjudicating the

Motion. *See Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).

Rios is a self-proclaimed First Amendment auditor who films police encounters out of a

desire to promote law enforcement accountability. *See* 2d Am. Compl. ¶¶ 21, 29, 42–43. On

November 24, 2021, Rios was walking near VIA Centro Plaza in San Antonio with a friend. *Id.*

¶ 22. They were both carrying cans of Cherry Coke Zero in brown paper bags. *Id.* They were

1

spotted by two VMTPD officers who believed that they were drinking alcohol. *Id.* ¶¶ 24, 28. The officers approached and tackled Rios to the ground. *Id.* ¶ 30. Rios was detained for more than twelve and a half minutes. *Id.* ¶ 61. He was eventually released after a supervising VMTPD officer issued him a criminal trespass warning ("CTW") banning him from VIA property. *Id.* ¶¶ 69–71, 77–78. Rios alleges that he was detained and given a CTW because of his status as an auditor. *Id.* ¶¶ 29, 42–43, 73.

Several months later, on March 8, 2022, Rios was arrested after he returned to the VIA Centro Plaza area and VMTPD officers recognized him as the subject of the CTW. *Id.* ¶ 94. Rios alleges that he was on publicly-owned property at the time of his arrest and that he was arrested and his firearm unlawfully seized in retaliation for his First Amendment auditor activities. *Id.* ¶¶ 94, 102, 108. After he was arrested, Rios was transferred to the county jail where he spent a total of eighteen hours. *Id.* ¶ 110. The charges against him were subsequently dropped several months later. *Id.* ¶ 125.

## A.    Procedural History

Rios brought suit on October 16, 2023, bringing claims under 42 U.S.C. § 1983 and the United States Constitution against VMTPD Officers Lara, Flores, Sarinana, Gutierrez, and Perez ("the Officers"); VIA Metropolitan Transit; and Universal Protection Service, LP.[1] *See generally* Compl., ECF No. 1. As to the individual Officers, he alleged violations of his rights under the First, Fourth, and Fourteenth Amendments. On March 31, 2025, the Court entered an order granting in part and denying in part the Officers' Motion for Summary Judgment, ECF No. 29. *See* Mar. 31, 2025, Order, ECF No. 43. The claims proceeding past summary judgment are Rios's Fourth Amendment unlawful seizure and excessive force claims against Lara and

---

[1] Rios dropped his claims against Universal Protection Service, LP when he filed his First Amended Complaint. *See generally* Am. Compl., ECF No. 6.

Flores, and his First Amendment retaliatory arrest claim against Lara, Flores, Sarinana, and Perez. *Id.* at 50.

Rios also brought claims against VIA on a theory of municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), which are the subject of this Motion. Rios filed a Response, ECF No. 36, to which Defendants filed a Reply, ECF No. 38.

### B.    Rios's *Monell* Claims

Rios asserts several *Monell* municipal liability claims against VIA. First, Rios asserts that VIA had an official policy of targeting people engaging in First Amendment auditor activities. 2d Am. Compl. ¶¶ 201–06. This official policy took the form of both a written directive from VMTPD Police Chief Mark Witherell, as well as a widespread pattern and practice. *Id.* ¶¶ 201–204, 214. Under this official policy, VMTPD officers documented and recorded all interactions with auditors and shared information about them with other law enforcement agencies. *Id.* ¶¶ 201, 204, 208. VMTPD officers also issued CTWs to auditors irrespective of whether criminal activity or entry onto VIA property had occurred. *Id.* ¶ 204. Auditors subject to a CTW were arrested if they returned to locations near VIA property, even if they did not actually enter VIA property. *Id.* ¶ 214. This customary policy and official directive existed despite VMTPD's general policy that individuals engaged in activities "contrary to the safe and secure operation of the system" should ordinarily be asked to stop the activity or leave, and that officers should only issue CTWs when an individual's actions "are more hazardous in nature." *Id.* ¶ 212.

Rios details three examples of occasions on which other people were subject to adverse actions by VMTPD employees for filming in public. *Id.* ¶¶ 202–04, 214. Rios also alleges that

VIA rewarded its officers based on the number of CTWs issued, without regard to whether they were issued lawfully, and that VIA officers were not obligated to report their use of force when interacting with auditors.  *Id.* ¶¶ 213, 217.  "[M]ultiple complaints" were brought to the attention of the VIA Board of Trustees, CEO, and Police Chief regarding VMTPD officers' treatment of individuals filming in public.  *Id.* ¶ 218.  No officers were disciplined in response to those complaints.  *Id.*

Finally, Rios asserts that VIA did not provide training to its officers on individuals' constitutional rights.  *Id.* ¶¶ 210.  Specifically, VIA did not provide VMTPD officers with any training on First or Fourth Amendment rights.  *Id.* ¶¶ 197–200.  However, Rios also alleges that several of the Officers involved received training, including the Texas Commission on Law Enforcement ("TCOLE") Basic Peace Officer Course, among others.  *Id.* ¶¶ 32, 60.

## II.     DISCUSSION

### A.     Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  In ruling on a Rule 12(b)(6) motion, "the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff."  *Calhoun*, 312 F.3d at 733; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted); *Colony Ins. Co.*, 647 F.3d at 252. Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## B.    Analysis

Defendants argue that all three of Rios's municipal liability claims against VIA must be dismissed. Mot. ¶¶ 10–11, 20. Under *Monell*, a municipality "can be sued directly under § 1983 . . . [where] the action that is alleged to be unconstitutional implements or executes a policy . . . officially adopted and promulgated by [the municipality's] officers." 436 U.S. at 690. To state a *Monell* claim, a plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

An "official policy or custom" is most clearly established through a formal directive officially adopted and promulgated by a policymaker. *See Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984), *modified on reh'g on other grounds*, 739 F.2d 993 (5th Cir. 1984).

When an "official policy" is not so explicit, the "persistent, widespread practice of city officials or employees . . . so common and well settled as to constitute a custom that fairly represents municipal policy" will suffice. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) (quoting *Webster*, 735 F.2d at 841). Official policy may also exist where a municipality fails to train its employees, demonstrating a "deliberate indifference" to the rights of its inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989). Lastly, the existence of a custom or policy may be shown through a "single unconstitutional action" performed by a "final policymaker." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)).

Rios's *Monell* claims fall under three of these umbrellas. First, Rios alleges that VIA implemented a formal directive instructing its officers to target First Amendment auditors and people who film in public. 2d Am. Compl. ¶ 201. Second, Rios alleges that VIA officers displayed a widespread pattern of targeting First Amendment auditors through actions such as issuing CTWs and arresting them without regard to whether criminal conduct or entry onto VIA-owned property had occurred. *Id.* ¶¶ 201–18. And third, Rios alleges that VIA failed to provide officers with sufficient training on the First and Fourth Amendments. *Id.* ¶¶ 197, 210.

### 1.     Policy of targeting First Amendment auditors

#### a.     Written Directive

Beginning with the written policy allegations, Rios alleges that VIA Chief of Police Mark Witherell created an "official bulletin," sent to all "VIA Transit police personnel" that instructed officers to target individuals filming police activity and engaging in other First Amendment protected activity. *Id.* ¶¶ 201, 204. Rios makes two general allegations regarding Witherell's bulletin: (1) that it instructs VMTPD officers to document their interactions with auditors and

that this information is shared with other law enforcement agencies, *id.* ¶¶ 201, 204–07, and (2) that it directs officers to issue CTWs to individuals filming police activities, "[e]ven if no criminal conduct or entry on VIA property occurred," *id.* ¶ 204.

An official, written policy is facially unconstitutional if it "affirmatively allows or compels unconstitutional conduct." *Verastique v. City of Dallas*, 106 F.4th 427, 435 (5th Cir. 2024) (quoting *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023)). Where a policy merely "commits some decisions to an individual officer's on-the-scene discretion, or gives some detailed instructions while omitting others," then it is not ordinarily facially unconstitutional. *Edwards*, 70 F.4th at 309. Accordingly, a use of force policy that grants discretion to an officer in a way that *could* lead to unconstitutional violations is not facially unconstitutional unless it requires or compels officers to exercise this discretion in a way that violates the Constitution. *See Verastique*, 106 F.4th at 435. Nor is a policy facially unconstitutional if it merely "leaves out 'detailed guidance that might have averted a constitutional violation.'" *Edwards*, 70 F.4th at 310 (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007)).

Rios first alleges that Witherell's policy requires officers to "perform[] surveillance on [auditors]," and that the information gleaned from this surveillance is shared with other law enforcement agencies. 2d Am. Compl. ¶ 201. Rios does not provide much detail as to what type of surveillance VMTPD officers allegedly conduct, but it seems to primarily take the form of officers documenting their interactions with auditors. *Id.* ¶¶ 201, 204, 206–07. This includes collecting video footage and writing police reports. *Id.* ¶ 206. Officers are also required to "determine any rule or ordinance violation" upon arriving at a location where an auditor is present. *Id.* This aspect of Witherell's directive does not compel or affirmatively require any

unconstitutional conduct.  The Court is aware of no authority—and Rios provides none—to support the notion that it is unconstitutional for police to write reports, film public interactions, or determine whether someone is violating the law.  *Cf. United States v. Dennis*, 41 F.4th 732, 741 (5th Cir. 2022) (holding, in the context of extended pole camera surveillance, that recording areas "open to view of the public" does not implicate the Fourth Amendment).  Because it does not compel unconstitutional behavior, this component of Witherell's directive does not constitute a facially unconstitutional formal policy.  *See Verastique*, 106 F.4th at 435.

Rios next alleges that Witherell's directive requires officers to attempt to "lure [auditors] onto VIA property" and issue them CTWs "[e]ven if no criminal conduct or entry on VIA property occurred."  2d Am. Compl. ¶ 204.  A policy may be facially unconstitutional if it operates as a prior restraint on protected First Amendment activity.  *Bowar v. City of El Paso*, No. 3:21-cv-257-KC, 2022 WL 1721212, at *8 (W.D. Tex. May 27, 2022), *adopted in pertinent part*, 609 F. Supp. 3d 541 (W.D. Tex. 2022).  Prior restraints are "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur."  *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005) (quoting *Alexander v. United States,* 509 U.S. 544, 550 (1993)); *see also Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004).  The determinative factor "is whether the challenged regulation authorizes suppression of speech in advance of its expression."  *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (emphasis omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989)); *see also Alexander*, 509 U.S. at 554.  Although "prior restraints are not unconstitutional per se, any system of prior restraint comes to [the] Court bearing a heavy presumption against its constitutional validity."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (cleaned up)

(quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)).  A prior restraint is generally only upheld if the conduct proscribed poses a "clear and present danger, or a serious or imminent threat to a protected competing interest," *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996) (quoting *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975)), and there are sufficient procedural safeguards in place, *Collins*, 382 F.3d at 539.

 Courts have held that CTWs can constitute an unconstitutional prior restraint on protected speech when they serve to prospectively prevent an individual from entirely engaging in protected First Amendment activity.  *See Bennett v. Prosper ISD Police Dep't*, 719 F. Supp. 3d 606, 615 (E.D. Tex. 2022); *Wilson v. N. E. Indep. Sch. Dist.*, No. 5:14-cv-140-RP, 2015 WL 13716013, at *5 (W.D. Tex. Sept. 30, 2015); *Cuellar v. Bernard*, No. 5:13-cv-91-XR, 2013 WL 1290215, at *3 (W.D. Tex. Mar. 27, 2013); *see also Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005) (equivalent of CTW that prohibited a plaintiff from accessing courtrooms was unconstitutional restriction on First Amendment right of access to the courts); *cf. Ordonez v. Gonzalez*, No. 3:23-cv-99-KC, 2024 WL 1250181, at *25 (W.D. Tex. Mar. 25, 2024) (police officers imposed unconstitutional prior restraint when enforcing policy preventing filming of police without prior approval).  For example, in *Bennett*, a parent who used profanity at a school board meeting was issued a CTW, barring him from attending any school board meetings for three months.  719 F. Supp. 3d at 610.  The court held that the CTW was "stunningly broad" and constituted a prior restraint on protected speech because it "entirely 'prohib[ited] the utterance' of speech by [the plaintiff] at any School Board meetings."  *Id.* at 615–16 (citation omitted).  The Court also found that there was no compelling government interest that justified the imposition of the CTW and that there were several less restrictive options open to the school other than banning him from the meetings entirely.  *Id.* at 616.

Rios alleges that Witherell's directive requires that VMTPD officers issue CTWs to auditors even if they have not committed any criminal conduct or entered VIA property. 2d Am. Compl. ¶ 204. Auditors are issued CTWs solely for filming police in public locations and the CTWs prevent them from filming police in public locations in the future. *Id.* ¶¶ 204, 214. Filming police in public is a protected First Amendment activity. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017); *see also Buehler v. Dear*, 27 F.4th 969, 992 (5th Cir. 2022); *Cuellar*, 2013 WL 1290215, at *2. "[S]treets; sidewalks and parks" and "public transportation facilities" are "public forums for certain first amendment activities," and government actors are therefore limited as to the restrictions they can place on individuals' exercise of their speech rights in these settings. *Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.*, 478 F. Supp. 1250, 1256 (N.D. Tex. 1979) (collecting cases), *aff'd*, 656 F.2d 1175 (5th Cir. 1981), *modified*, 670 F.2d 629 (5th Cir. 1982); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *Bowar*, 2022 WL 1721212, at *8.

To be sure, the right to film police is subject to "reasonable time, place, and manner restrictions," *Lieutenant Driver*, 848 F.3d at 690 (citing *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011)), and courts have recognized a government interest in avoiding disruption to public spaces and transit systems, *see, e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 375 (1997); *cf. Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 501 (9th Cir. 2015). But Rios alleges what amounts to a categorical ban on individuals' ability to film police activity on or near VIA-owned property. 2d Am. Compl. ¶ 204 (alleging the directive instructed officers to give auditors CTWs "[e]ven if no criminal conduct or entry on VIA property occurred"). As in *Bennett*, Witherell's directive thus resulted in a complete curtailment of a First Amendment right in this sphere. 719 F. Supp. 3d at 615–16. And as in *Bennett*, it is

plausible that there are several less restrictive options open to VIA to manage potentially disruptive auditor behavior. *See id.* at 616–17. Finally, because Rios alleges that he was not informed which locations the CTW applied to, how to challenge the CTW, or when it expired, he also plausibly alleges that the warning was issued to him without adequate procedural safeguards. 2d Am. Compl. ¶¶ 87–89; *see Cuellar*, 2013 WL 1290215, at *3.

Accordingly, the Court finds that Rios has sufficiently alleged that Witherell's official bulletin was a facially unconstitutional written directive.

### b.    Widespread Practice or Custom

Rios also seeks to establish an official VMTPD policy in the form of a widespread practice or custom. To do so, a plaintiff must show that similar unconstitutional acts "have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow*, 614 F.3d at 169 (citing *Webster*, 735 F.2d at 842). That is, a pattern requires "[s]ufficiently numerous prior incidents," not "[i]solated instances." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (citations omitted). A pattern also requires similarity and specificity; "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (collecting cases).

Here, in addition to the incidents involving himself, Rios alleges that two other people were subjected to adverse police action in retaliation for engaging in protected First Amendment activity. 2d Am. Compl. ¶¶ 202–14. The first example involves Jack Miller, a YouTube channel operator who was filming at VIA Centro Plaza in August 2016. *Id.* ¶ 202. Rios alleges that Miller attempted to ask VMTPD officers a question and was then issued a verbal trespass

warning.  *Id.*  Rios alleges that, later that month, Miller was filming at a different location when a VMTPD officer approached him, told him to leave "because he was videotaping," and ordered him to "stay off of VIA property."  *Id.* ¶ 203.  The second person, another YouTuber named Tory Ries, was allegedly arrested pursuant to an active CTW when standing on a public sidewalk in June 2022.  *Id*. ¶ 214.  Defendants argue that the three alleged events involving Ries and Miller fail to establish a pattern for purposes of *Monell* liability because they are factually dissimilar to the incidents involving Rios and insufficiently numerous.  Reply ¶¶ 6–8.

Beginning with similarity, Rios alleges that Ries was arrested when standing on a public sidewalk after being issued a CTW.  2d Am. Compl. ¶ 214.  But Rios does not provide any allegations regarding the circumstances of Ries's arrest or the circumstances leading to Ries being issued a CTW.  *Id.*  For instance, Rios does not allege whether Ries was issued a CTW after filming police or engaging in First Amendment auditor activities.  *See generally id.*

Similarity requires that the "constitutional deficiencies" alleged in the other incidents are "on all-fours with those complained of by Plaintiff[]."  *Hicks-Fields v. Harris County*, 860 F.3d 803, 810 (5th Cir. 2017); *accord Cheeley v. Rodriguez*, No. 24-cv-862, 2025 WL 624490, at *3–4 (N.D. Tex. Feb. 26, 2025).  Without additional information, the Court cannot determine the extent to which Ries was subject to the same sort of First Amendment violations allegedly experienced by Rios.  Although prior incidents need not be identical to the facts at hand to demonstrate a pattern of similar constitutional violations, s*ee Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 609 (W.D. Tex. 2023), there must be some factual basis for the Court to establish that the prior violations were sufficiently similar.  *See Verastique*, 106 F.4th at 432 (rejecting allegations of prior incidents as "inscrutably vague").  Here, Rios was allegedly issued a CTW and later arrested in retaliation for exercising his First Amendment right to film the police.  2d

Am. Compl. ¶¶ 29, 36, 42, 69, 71, 73, 98–111.  Without any allegation of whether Ries was

filming prior to his own arrest, the Court is unable to determine the extent to which the incident

involving Ries entailed the same sort of constitutional violation allegedly experienced by Rios.[2]

For their part, the allegations involving Miller entail constitutional violations more

comparable to those allegedly experienced by Rios.  *Id.* ¶ 202.  Miller was filming in VIA Centro

Plaza when he was told to leave the area, apparently after asking VMTPD officers a question,

and then threatened with criminal trespass for filming at another location.  *Id.* ¶¶ 202–04.

Because he was retaliated against for filming the police, Miller allegedly suffered constitutional

violations very similar to the ones that form the basis of this lawsuit.

But even if the Court assumes that the Ries and Miller incidents are all suitably similar,

these three examples are insufficient to constitute a pattern as opposed to merely "isolated

instances."  *Edwards v. City of Balch Springs*, 70 F.4th 302, 313 (5th Cir. 2023).  Courts

generally require allegations of significantly more incidents to establish a pattern.  *See, e.g.*,

*Stewart v. Loftin*, No. 21-cv-3789, 2025 WL 751314, at *8 (W.D. La. Feb. 20, 2025)

(recommending granting motion to dismiss where plaintiff alleged five other incidents to

demonstrate a pattern), *adopted*, 2025 WL 750198 (Mar. 7, 2025); *Armstrong v. Ashley*, 60 F.4th

262, 277–78 (5th Cir. 2023) (nine incidents over twenty-four year period not sufficient to

establish a pattern); *Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2016) (twenty-one

---

[2] Rios's allegations that VIA rewards VMTPD officers for issuing CTWs similarly lack the necessary information to determine whether they could support a widespread practice claim.  2d Am. Compl. ¶ 213. Rios does not provide any details regarding when or how VMTPD officers are rewarded for issuing CTWs, beyond stating that an "Officer Phauls" was once given a positive performance review for issuing five CTWs in one day.  *Id.*  But Rios does not state when this occurred or provide any details regarding the circumstances under which Phauls's CTWs were issued.  *Id.*  Critically, Rios does not allege that Phauls issued CTWs to auditors or other people filming in public.  *Id.*  Without this information, it is not possible to determine the extent to which Officer Phauls's CTWs were issued in circumstances similar to that of Rios and—thus—the extent to which they help demonstrate a pattern of similar constitutional violations.  *Id.*

incidents was not sufficient to establish a pattern); *see also Dubash v. City of Houston*, No. 23-cv-3556, 2024 WL 4351351, at *10 (S.D. Tex. Aug. 26, 2024), *adopted*, 2024 WL 4355196 (Sept. 30, 2024). The nadir in this Circuit appears to be four. *See Barr v. City of San Antonio*, No. 5:06-cv-261-XR, 2006 WL 2322861, at *4 (W.D. Tex. July 25, 2006) (denying motion to dismiss but expressing "serious reservations" about the plaintiff's *Monell* pattern claim). Counting generously, Rios has alleged three other incidents, involving two other people. This is simply too few to constitute a widespread pattern. *See, e.g.*, *Armstrong*, 60 F.4th at 277.

Plaintiffs can bolster their allegations of specific prior instances with statistics or other information that indicates the problem is more widespread. *See, e.g.*, *Ramirez v. Escajeda*, 298 F. Supp. 3d 933, 943 (W.D. Tex. 2018). Rios offers no statistics. *See generally* 2d Am. Compl. Apart from the specific examples involving Ries and Miller, Rios alleges that "multiple complaints" regarding VMTPD officers' treatment of individuals filming in public were "filed with VIA." 2d Am. Compl. ¶ 218. But Rios does not provide any details regarding the incidents that led to the alleged complaints. *Id.* He does not allege the number of complaints that were filed or when or how they were filed. *Id.* And even assuming the three specified incidents all led to complaints, those three complaints would no more establish a pattern than would the three underlying incidents. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (twenty-seven complaints of excessive force were not sufficient to establish pattern).

In sum, Rios has not alleged the existence of a pattern that "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (quoting *Peterson*, 588 F.3d at 850).

### 2.    Policymaker Knowledge

Turning to the second element, Defendants argue that Rios's claims must be dismissed because he did not allege that the "Board of Trustees delegated policy making authority to either the Chief or CEO related to alleged treatment of 'auditors.'" Mot. ¶ 12. To attribute a policy or custom to a municipal defendant, a person with final policymaking authority must have had knowledge of the policy. *See Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019); *Valle*, 613 F.3d at 542 (citation omitted). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Zarnow*, 614 F.3d at 167 (citing *Webster*, 735 F.2d at 841). Rios alleges that the VIA Board of Trustees, its President and CEO Jeffrey C. Arndt, and Chief of Police Mark Witherell exercise final policymaking authority for VIA. 2d Am. Compl. ¶ 3. If Witherell were a VIA policymaker, then his personal promulgation of the official bulletin would serve to establish the knowledge element of Rios's *Monell* claim.

A municipality may delegate policymaking authority (1) by express statement or formal action, or (2) by conduct or practice that encourages or acknowledges the agent in a policymaking role. *Zarnow*, 614 F.3d at 167 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)). A plaintiff does not need to plead the specific identity of the policymaker to survive the motion to dismiss stage. *Balle v. Nueces County,* 952 F.3d 552, 559 (5th Cir. 2017); s*ee Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). But a plaintiff must allege sufficient facts to connect a defendant's acts to a specific official policy, which was "promulgated or ratified by the legally authorized policymaker." *Groden*, 826 F.3d at 282. "In other words, plaintiffs must plead facts that sufficiently connect the policymaker . . . to the allegedly unconstitutional policy." *Longoria ex. rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (citing *Groden*, 826 F.3d at 284, 286). Allegations that

merely point to conduct by municipal employees do not suffice.  *See Hobbs v. Warren*, No. 19-cv-47, 2020 WL 2616522, at *3 (N.D. Tex. Feb. 10, 2020), *adopted*, 2020 WL 2616333 (May 22, 2020).  In determining who is a policymaker, courts examine state law and other documents that establish a municipality's operation and structure, such as a city's charter.  *See Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, 950 (N.D. Tex. 2014).

### a.    Police Chief as Policymaker

There is no bright line rule for determining whether a police chief of a Texas municipality is a policymaker.  Although the Fifth Circuit has "previously found that Texas police chiefs are final policymakers for their municipalities . . . it has often not been a disputed issue in [those] cases."  *Hughes v. City of Dallas*, No. 18-cv-1770, 2020 WL 4670659, at *2 (N.D. Tex. Aug. 11, 2020) (collecting cases).  Further, because determining whether an entity is a policymaker for a particular municipality is fact-bound, policymaker determinations are inherently individualized for each municipality and often have limited applicability when determining the policymakers of other municipalities.  *Compare Zarnow*, 614 F.3d at 168 (Wichita Falls police chief found to be policymaker), *and Oporto v. City of El Paso*, No. 3:10-cv-110-KC, 2010 WL 3503457, at *4 (W.D. Tex. Sept. 2, 2010) (El Paso police chief found to be policymaker), *with Hughes*, 2020 WL 4670659, at *4 (Dallas police chief not policymaker), *and Guzman v. City of Dallas*, No. 09-cv-2426, 2010 WL 4514369, at *3 (N.D. Tex. Aug. 31, 2010) (same), *adopted*, 2010 WL 4514364 (N.D. Tex. Nov. 9, 2010).

Rios does not make any allegations related to an express or formal delegation of policymaking authority by VIA to Witherell.  *See generally* 2d Am. Compl.  Nor does such an explicit delegation appear in the laws under which VIA is established.  VIA is a "public political entity" and "governmental unit" that was created pursuant to Chapter 451 of the Texas

16

Transportation Code.  *See VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 360 (Tex. 2020).  The Texas Transportation Code provides that the "board" of a Metropolitan Rapid Transit Authority such as VIA operates as the "governing body" of the authority, Tex. Transp. Code § 451.001, and that it "is responsible for the management, operation, and control of an authority and its property."  *Id.* § 451.053.  The board's powers include making employment decisions such as hiring a general manager and removing employees, as well as financial decisions such as setting the authority's budget.  *Id.* § 451.101.  Where an authority is required to employ a general manager, the general manager is the only official empowered to remove employees.  *Id.* § 451.106.  Even then, the general manager is bound by the board's personnel policies, and the board retains control over contract decisions.  *Id.* § 451.106.  The Code also provides that certain transit authorities "may commission and employ peace officers," though it does not specify the organizational structure of a transit authority's police department or provide any other information regarding how they are governed.  *Id.* § 451.108.

Where a municipality's governing documents establish that a police chief is subject to the supervision of another official or body within a municipality's structure, this weighs against finding that the chief is a policymaker.  *See Flanagan*, 48 F. Supp. 3d at 950 (collecting cases). So too does "formal subservience," where another person or entity is responsible for both hiring and removing the chief.  *See Crowder v. Sinyard*, 884 F.2d 804, 829 (5th Cir. 1989), *abrogated in part on other grounds*, *Horton v. California*, 496 U.S. 128 (1990).  Because the Texas Transportation Code establishes that power over employment decisions is ultimately vested in the board, the police chief is at least formally subservient to the VIA Board of Trustees.  Further, as the Board of Trustees is identified as VIA's overall "governing body," with no apparent delegation of that ultimate authority for policing, it appears that the VMTPD Chief remains

17

subject to the Board of Trustees' supervision. Rios makes no allegations to suggest otherwise. *See generally* 2d Am. Compl. Thus, the Court finds that Witherell was not explicitly delegated policymaking authority by VIA.

But even in the absence of a formal delegation of power, an official can still function as a policymaker when they exercise independent policymaking authority such that the municipality has impliedly delegated its policymaking authority to them. *See Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 750 (S.D. Tex. 2011). Relevant to this analysis, Rios alleges that Witherell's bulletin contains a range of directives governing procedures for interactions between VMTPD officers and auditors. 2d Am. Compl. ¶¶ 201, 204–06. Courts have held that a police chief's power to issue binding orders that constrain or instruct police officers in their conduct can establish that they have been impliedly delegated policymaking authority in a particular sphere. *See Zarnow*, 614 F.3d at 167; *Hobart*, 784 F. Supp. 2d at 750; *see also Murphy v. City of Ville Platte*, No. 18-cv-834, 2018 WL 6920357, at *9 (W.D. La. Dec. 12, 2018), *adopted*, 2019 WL 81650 (Jan. 2, 2019). But such a finding requires that the police chief exercised significant independent policymaking power.

For instance, in *Zarnow*, the plaintiff produced several "General Orders" issued by the chief of police that purported to be "policy of [the] department" and that were binding on the officers until reviewed or altered by the city manager or city council. 614 F.3d at 167. This evidence established that the chief of police was effectively the "sole official responsible for internal police policy." *Id.* at 168. And in *Robinson v. City of Garland*, the plaintiff produced evidence regarding the scope of the police chief's oversight of the department, including his control of budgetary, personnel, and disciplinary matters. No. 10-cv-2496, 2016 WL 7396048, at *9 (N.D. Tex. Aug. 17, 2016). The evidence also established that the chief was the "final

word" on general orders and procedures within the police department and that he did not require approval from the city council in that sphere.  *Id.*  Thus, irrespective of the fact that the chief was formally subject to replacement by the city manager and city council, the Court found this evidence sufficient to establish a genuine issue of material fact as to whether he was a policymaker.  *Id.* at *9.

By contrast, in *Monacelli v. City of Dallas*, the chief promulgated general orders for the department and implemented policies relating to the department's practices and training.  No. 21-cv-2649, 2023 WL 6563410, at *7 (N.D. Tex. Sept. 1, 2023), *adopted*, 2023 WL 6370753 (Sept. 29, 2023), *aff'd*, No. 24-10067, 2024 WL 4692025 (5th Cir. Nov. 6, 2024).  But the court found these allegations to be insufficient because the city's charter included language that established that the police chief's authority was ultimately limited to implementing policies developed by the city manager.  *Id.*  The court reasoned that a *Monell* policymaker "decides the goals for a particular [municipal] function and devises the means of achieving those goals," as opposed to merely implementing the goals of a higher official.  *Id.* at *5.  Thus, while the police chief was exercising significant decision-making authority, it did not rise to the level of policymaking authority.  *Id.*

Here, unlike in *Zarnow*, Rios alleges only that Witherell issued one directive to VMTPD officers, rather than multiple general orders.  2d Am. Compl. ¶ 204; *Zarnow*, 614 F.3d at 167.  And unlike *Robinson*, there are no allegations that Witherell exercised broader de facto policymaking authority for VIA policing, such as making final personnel decisions and setting the budget.  2016 WL 7396048, at *9.  Indeed, as discussed, state law reserves such functions for the board.  Tex. Transp. Code § 451.101.  To be sure, the situation here is distinct from *Monacelli* in that there does not appear to be language in the Texas Transportation Code

19

affirmatively prohibiting Witherell from establishing his own policing policies. *See* 2023 WL 6563410, at *7. But without further allegations regarding the scope of Witherell's and the Board of Trustees' respective oversight of the VMTPD, Rios has at best established that Witherell possesses significant decision-making authority, which falls short of policymaking authority. *See Webb v. Town of Saint Joseph*, 925 F.3d 209, 217 (5th Cir. 2019); *Longoria*, 942 F.3d at 271. Accordingly, Rios has failed to plausibly allege that Witherell is a VIA policymaker, and Witherell's knowledge of his own facially unconstitutional bulletin does not suffice to impute that knowledge to VIA.

### b. Board of Trustees' Knowledge of Unconstitutional Policy

Certainly, it is plausible that the Board of Trustees is a VIA policymaker. *See* Tex. Transp. Code § 451.001. Therefore, Rios can satisfy the policymaker knowledge element by plausibly alleging that the Board had actual or constructive knowledge of the constitutional violations resulting from the official policy. One way to establish a policymaker's constructive knowledge is through allegations of a widespread pattern of similar incidents or complaints thereof. *K.B. v. Adams*, 480 F. Supp. 3d 746, 756 (S.D. Miss. 2020); *Boles v. Navarro Coll.*, No. 19-cv-2367, 2020 WL 6273765, at *5 (N.D. Tex. Oct. 26, 2020). But for the same reasons, discussed above, that the three prior incidents alleged by Rios are insufficient to establish a de facto policy, they fail to establish the Board's constructive knowledge. *See Webster*, 735 F.2d at 842; *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1077 (S.D. Tex. 2000), *dismissed*, 252 F.3d 1355 (5th Cir. 2001), *aff'd*, 291 F.3d 325 (5th Cir. 2002). And none of Rios's allegations establish that the Board was actually aware of Witherell's bulletin. *See generally* 2d Am. Compl.

In sum, Rios plausibly alleges the existence of a facially unconstitutional policy, Witherell's bulletin, instructing VMTPD officers to target auditors. But Rios fails to plausibly allege a widespread pattern or practice of unconstitutional targeting of auditors. And he fails to plausibly allege that VIA's policymaker, its Board of Trustees, had actual or constructive notice of Witherell's bulletin. Accordingly, because Rios does not sufficiently allege that a VIA policymaker had knowledge of an unconstitutional policy, both Rios's official policy and his widespread pattern and practice *Monell* claims must be dismissed.

### 3.    Failure to Train

Rios separately claims that VIA has a custom of failing to train its officers on auditors' constitutional rights. 2d Am. Compl. ¶¶ 197–98, 210. "A claim for failure to train must allege sufficient facts to show that (1) the municipality adopted inadequate training policy procedures, (2) acted with deliberate indifference in doing so, and (3) the inadequate training policy directly caused the plaintiff's injury." *Speck v. Wiginton*, 606 F. App'x 733, 736 (5th Cir. 2015) (citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)). A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)).

The Supreme Court has held "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. Here, the Court has already determined that Rios's allegations fail to establish a pattern of similar constitutional violations.[3] *See Armstrong*, 60 F.4th at 277 (failure to train claim failed when plaintiff failed to establish pattern of

---

[3] To the extent that Rios asserts a separate failure to discipline claim, 2d Am. Compl. ¶¶ 218–19, it fails because such claims also require allegations of a pattern of similar constitutional violations. *See Johnson v. Dallas Cnty. Hosp. Dist.*, No. 23-cv-1574, 2024 WL 4394772, at *10 (N.D. Tex. Oct. 3, 2024).

constitutional violations); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 407 (1997).

Rios can therefore only establish deliberate indifference on the part of VIA under the "single incident exception." *Valle*, 613 F.3d at 549. This extremely narrow exception requires Rios to plausibly allege that the constitutional violation he experienced was the "highly predictable consequence" of VMTPD's failure to train its officers. *Connick*, 563 U.S. at 64; *Valle*, 613 F.3d at 549. It generally only applies in instances where a government actor "was provided no training whatsoever." *Hutcheson v. Dallas County*, 994 F.3d 477, 483 (5th Cir. 2021). Stated differently, the single-incident exception applies when there is a complete failure to train, "not just a failure to train in one limited area." *Peterson*, 588 F.3d at 849. To proceed under the single-incident exception, the "municipal entity must have 'fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'" *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624–25 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 396 (O'Connor, J., concurring)); *see also Degollado v. Solis*, 617 F. Supp. 3d 668, 682 (S.D. Tex. 2022).

For example, in *Sneed v. Austin Independent School District*, the court found that a plaintiff's allegations did not warrant application of the single-incident exception when the plaintiff alleged that a school district's training was inadequate as it related to "harassment based on 'cultural issues' like implicit racial bias." 487 F. Supp. 3d 584, 596 (W.D. Tex. 2020). Because the plaintiff did not allege that the district "completely failed to train on harassment and discrimination," the court found that the plaintiff's allegations established that training was only inadequate in "one limited area." *Id.* By contrast, in *Littell*, the plaintiffs sufficiently alleged a failure-to-train claim under the single-incident exception when they alleged that a school district

22

completely failed to train its employees on their legal obligations not to conduct unconstitutional searches. 894 F.3d at 625. The plaintiffs alleged that an assistant principal ordered a "mass, suspicionless strip search of the underwear of twenty-two preteen girls," and both parties agreed that this conduct violated the constitutional rights of the students involved. *Id.* at 619. Because the school district expressly vested search authority in all its school officials, the Fifth Circuit held that the duty to refrain from unreasonable searches was plausibly alleged to arise in "recurrent situations" for employees of the school district. *Id.* at 626. Therefore, the plaintiffs had plausibly alleged a failure to train claim based on the single-incident exception.

Further, in *Brown v. Bryan County*, the Fifth Circuit held that the single-incident exception was applicable when a county sheriff did not provide any training whatsoever to a new deputy, who then went on to use excessive force against the plaintiff which resulted in severe knee injuries. 219 F.3d 450, 452–53 (5th Cir. 2000). The Fifth Circuit held that the defendant had notice of the obvious need to train the deputy because it was common knowledge in the sheriff's department that he frequently used force when arresting suspects and he was also known to have a "reckless background." *Id.* at 453, 462. Accordingly, the plaintiff's allegations sufficed to state a claim under the single-incident exception.

Turning to Rios's allegations, he alleges that VIA "did not provide its officers with the necessary comprehensive training on the Constitution or how Constitutional Law applies to their job duties." 2d Am. Compl. ¶ 197. Specifically, he alleges that VIA's "official training materials" "do not include any modules on First or Fourth Amendment rights" and that none of the individual officers sued in this case "received any training on constitutional law since joining VIA." *Id.* But these assertions are contradicted by Rios's other allegations. For example, Rios also alleges that Officer Lara received Texas Commission on Law Enforcement (TCOLE)

training during her Basic Peace Officer Course prior to the first incident with Rios, as well as a

continuing education course on "De-Escalation and Minimizing Use of Force." *Id.* ¶ 32.  Rios

further alleges that three of the other police officers present during the November 2021 incident

received TCOLE training during the Basic Peace Officer Course, which allegedly included

training on "Arrest, Search, and Seizure," "Civilian Interaction Training," and "Mechanics of

Arrest & Search." *Id.* ¶¶ 60, 63.

Courses relating to the use of force, arrest, and search all implicate the Fourth

Amendment, so it does not follow that VIA entirely failed to train its officers on these

Constitutional protections.  *See McCully*, 406 F.3d at 386 (declining to apply single-incident

exception when there was some form of training provided).  The Court takes judicial notice of

the fact that the TCOLE Basic Peace Officer Course has included ten hours of training on the

U.S and Texas Constitution and the Bill of Rights since at least 1994.[4]  *Course Content and*

*Hours of The BPOC from 1970 to Current*, Tex' Comm'n L. Enf't 7–20,

https://www.tcole.texas.gov/document/history_of_bpoc-2023.pdf (last visited Apr. 9, 2025).

Additionally, the course includes dedicated content related to arrests, search and seizure, and the

use of force, which are all quintessential Fourth Amendment topics.  *See id.* at 19–20.  To the

extent there were any doubt, the most recent TCOLE Basic Peace Officer Course curriculum also

shows that the course content related to the United States Constitution specifically includes the

---

[4] When adjudicating a Rule 12(b)(6) motion, a court may consider only the contents of the complaint, documents attached to the complaint, or matters appropriate for judicial notice under Federal Rule of Evidence 201.  *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).  "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Courts may take "judicial notice of information posted on a government website."  *See Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 353 n.5 (5th Cir. 2011).  The Texas Commission on Law Enforcement is a Texas government agency, and the Court takes judicial notice of the contents of its website.

First Amendment. *Basic Peace Officer Course 736*, Tex. Comm'n L. Enf't, https://www.tcole.texas.gov/course-curriculum-materials-and-updates (last visited Apr. 9, 2025).

As to Flores, Rios alleges that he is a "TOPS-certified Level III Classroom Instructor" and a commissioned security officer. 2d Am. Compl. ¶ 37. Rios does not allege any information regarding the content of any training he received, beyond stating that Flores could have "relied on his training to defuse the situation." *Id.* The Court takes judicial notice that the Texas Public Safety Commission training for commissioned security officers includes training on the use of force and applicable rules and state laws. Tex. Occ. Code § 1702.1675. Flores therefore also received some form of training that, at the very least, included some consideration of the Fourth Amendment, and potentially more.

Rios's own allegations thus demonstrate that many of the VMTPD Officers that detained him on November 24, 2021, and March 8, 2022, in fact received training on the Constitution. And this included training related to both First and Fourth Amendments. As discussed, courts generally only apply the single-incident exception in instances where a party alleges or demonstrates an entire lack of training whatsoever. Rios's own allegations demonstrate this is not the case here. Indeed, the Court itself rejected this argument from Rios previously, before this matter was transferred to the undersigned Judge. *See* July 1, 2024, Order 19, ECF No. 28 ("Because Plaintiff seems to suggest that Defendant VIA offered *some* training on de-escalation, he cannot rely on the single-incident exception.").

Beyond alleging a general lack of training on the United States Constitution and the First and Fourth Amendments, Rios also alleges that the Officers did not receive training related to dealing with "Special Interest Groups/Persons Recording Video on VIA Property." 2d Am. Compl. ¶ 45. But even taking Rios's allegations as true, this failure to train would fall squarely

within "a failure to train in one limited area," rather than the wholesale failure to train that the single-incident exception demands. *See Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (citations omitted); *Peterson*, 588 F.3d at 849. Further, to the extent that Rios alleges that the Officers did not receive ongoing training related to the Constitution after passing the Basic Peace Officer Course, this raises arguments about the sufficiency of the training as opposed to whether any training was provided. "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68. Accordingly, such arguments do not give rise to a claim under the single-incident exception. *See Hershey v. City of Bossier City*, No. 21-cv-460, 2021 WL 4395056, at *8 (W.D. La. Aug. 23, 2021), *adopted*, 2021 WL 4395043 (Sept. 24, 2021).

Finally, even assuming that VIA had not provided its employees with any training whatsoever, other factors would counsel against applying the single-incident exception here. The single-incident exception is a disfavored exception that the "Fifth Circuit has been reluctant to expand." *See Dubash*, 2024 WL 4351351, at *11 (citing *Hutcheson*, 994 F.3d at 483). For that reason, courts generally only apply it in instances where the allegations are particularly egregious. Rios's allegations regarding the nature of the constitutional violation he experienced are of a completely different character than those in *Littel* or *Bryan*. *See Payton v. Town of Maringouin*, No. 18-cv-563, 2021 WL 2544416, at *28 (M.D. La. June 21, 2021) (dismissing plaintiff's failure-to-train claim because "this case is unlike those finding the single incident exception"), *aff'd*, 2022 WL 3097846 (5th Cir. Aug. 3, 2022). And the Court has not been able to find any instances where a court has applied the single-incident exception in similar circumstances. Indeed, courts that have considered whether the single-incident exception should be applied in the context of the First Amendment have generally rejected it. *See, e.g.*, *Lambert v.*

*City of Onalaska*, No. 23-cv-67, 2024 WL 1810527, at *5 (E.D. Tex. Apr. 3, 2024), *adopted*, 2024 WL 1809492 (Apr. 25, 2024); *Rusanowsky v. City of Dallas*, No. 22-cv-1132, 2023 WL 2728722, at *7 (N.D. Tex. Mar. 30, 2023); *Dubash*, 2024 WL 4351351, at *11.

 Further, it is also clear from Rios's allegations that he would be unable to clear the "high hurdle" of demonstrating that the violations he experienced were a "highly predictable consequence of a failure to train." *Valle*, 613 F.3d at 550. The Fifth Circuit has held that it is not enough that the constitutional violation experienced by the plaintiff must be foreseeable or plausible, rather, the plaintiff must prove "the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) (citing *Brown*, 520 U.S. at 409). The mere "possibility" or even "likelihood" of a constitutional violation is not sufficient. *Valle*, 613 F.3d at 550. That is, deliberate indifferent requires more than a showing of mere "simple or even heightened negligence." *Payton*, 2021 WL 2544416, at *29 (quoting *Valle*, 613 F.3d at 542). For all of these reasons, Rios's allegations do not establish the applicability of the single incident exception.[5]

 With this decision, the Court does not minimize the constitutional violations that Rios allegedly experienced. Indeed, the Court has recently allowed some of Rios's claims against the

---

[5] It appears that Rios may intend to bring not just a failure to train claim, but also a failure to discipline claim under the single-incident exception, though any such theory is poorly developed. *See* 2d Am. Compl. ¶ 219. To the extent it has been pleaded, this claim also fails. The failure to discipline single-incident exception first arose in *Grandstaff v. City of Borger*, where "dangerous[ly] reckless[]" police indiscriminately shot at and killed an innocent victim in the back as he emerged from his car. 767 F.2d 161, 171 (5th Cir. 1985). The Fifth Circuit inferred the existence of an official policy from the complete failure to discipline any of the officers involved. *Id.* But "[s]ubsequent Fifth Circuit cases emphasize that the rationale presented in *Grandstaff* may only be applied to cases with equally extreme factual circumstances." *Tarver v. City of Edna*, No. 03-cv-39, 2006 WL 3053409, at *8 (S.D. Tex. Oct. 26, 2006) (citations omitted). The allegations here fall well short of such extremes, and any claim for municipal liability based on the failure to discipline the Officers involved in detaining Rios are also dismissed. *See, e.g.*, *Edwards v. Oliver*, No. 17-cv-1208, 2019 WL 4603794, at *13 (N.D. Tex. Aug. 12, 2019), *adopted*, 2019 WL 4597573 (Sept. 23, 2019).

individual Officers to proceed past summary judgment.  Mar. 31, 2025, Order 50.  The Court

merely holds that Rios has not plausibly alleged grounds to impute liability to VIA.  To hold

otherwise would be to impermissibly subject VIA to the doctrine of respondeat superior, which

does not apply in § 1983 actions.  *See Payton*, 2021 WL 2544416, at *29.

## III.    CONCLUSION

For the foregoing reasons, the Court **ORDERED** that the Motion to Dismiss, ECF No.

34, was **GRANTED** and all of Plaintiff's claims against Defendant VIA Metropolitan Transit

were **DISMISSED**.

**SO ORDERED.**

SIGNED this 10th day of April, 2025.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE